(Nos. 51912, 51931 cons.—■

JOSEPH G. CATALANO *et al.*, Appellants, v. ROBERT C. PECHOUS *et al.* (Robert C. Pechous, Appellant; Mark Fineman *et al.*, Appellees).

*Opinion filed October 17, 1980.—Rehearing denied November 26, 1980.*

CLARK, J., concurring in part and dissenting in part.

Edward V. Hanrahan, of Chicago, for appellants.

James E. Gierach & Robert M. Winter, of Gierach, Stambulis & Schussler, Ltd., of Oak Lawn (Gerald W. Shea, of counsel), for appellees.

MR. JUSTICE WARD delivered the opinion of the court:

The plaintiffs, who are seven of the eight aldermen that comprise the city council of Berwyn, filed a complaint in the circuit court of Cook County against the defendants, Robert C. Pechous, the city clerk, Mark Fineman, a reporter for Suburban Week, a weekly supplement to the Chicago Sun-Times, and Field Enterprises, Inc. (Field), the publisher of the Sun-Times. The action sought damages for a defamatory statement allegedly made by Pechous at a council meeting and repeated several months later to Fineman, who quoted it in an article which appeared in Suburban Week.

Motions for summary judgment were filed by Pechous and by Fineman and Field. In each case the plaintiffs filed a reply and a cross-motion for summary judgment. The trial court granted the defendants' motions and denied those of the plaintiffs. On appeal the Appellate Court for

the First District reversed the circuit court's granting of Pechous' motion for summary judgment and its denial of the plaintiffs' motion for summary judgment and affirmed the award of summary judgment in favor of Fineman and Field (69 Ill. App. 3d 797). We granted petitions for leave to appeal filed by the plaintiffs and by Pechous. 73 Ill. 2d R. 315.

This litigation had its origin in a decision by the city council of Berwyn to abandon its practice of having garbage collected by municipal employees and to contract for its collection by private scavenger concerns. The city authorized the solicitation of bids and later awarded a contract to one of the bidders. The particulars, documented by materials which were before the circuit court on the motions for summary judgment, are set out in the opinion of the appellate court, and no more than a summary is required here.

At a meeting on December 19, 1975, the council voted to authorize the city comptroller to draw up specifications and advertise for bids for private scavenger service for the year 1976. Although no copy of the invitation to bid appears in the record, a letter of January 5, 1976, from the mayor to the council states that the invitations specified January 12 as the deadline for the submission of bids. The minutes of the December 19 meeting report that Pechous, as city clerk, was permitted to submit a communication addressed to the members of the city council which, according to the minutes, "raised substantive questions concerning the contemplated shift by the city from municipal refuse collection to private scavenger service." The minutes do not disclose the contents of this communication, and no copy of it appears in the record.

Three scavenger companies submitted bids before the January 12 date, and at a council meeting on December 29 these bids were opened, and the bid of one company, Clearing Disposal, Inc., which was the lowest bidder, was

accepted. A fourth company, SCA Services, which had planned to submit a bid by January 12, had not done so by the time of the December 29 meeting. The mayor vetoed the award of the contract to Clearing, but the council overrode the veto at a meeting held on January 12, 1976. At that meeting the council also voted to return unopened a bid which had been received from SCA Services.

It was the meeting of December 29 at which Pechous was alleged to have initially made his defamatory statement. Counts I and II of the complaint, which were directed against Pechous, alleged:

"1. That on December 29, 1975, at a meeting of the Berwyn City Council, The Defendant Pechous falsely and maliciously, with intent to injure the Plaintiffs' good names, uttered to third persons and caused to be published in Cook County Illinois the following false, defamatory and malicious statement, in connection with the awarding of a contract for garbage collection to Clearing Disposal, Inc. by the said Berwyn City Council which is composed of the Plaintiff Alderpersons:

'Two hundred forty pieces of silver changed hands—thirty for each alderman.'

2. That the Defendant Pechous subsequently uttered the following false, malicious, and defamatory statement concerning the Plaintiffs to the Defendant Fineman, regarding the awarding of said contract, with intent to injure the plaintiffs' good names, and thereby caused said statement to be published in an article in the Chicago Sun-Times, a newspaper printed and circulated in Cook County Illinois:

'Something smells in this contract more than garbage *** I said at the council meeting when the contract was first awarded that I think 240 pieces of silver changed hands—30 for each alderman. *** There was just something suspicious about the way that contract was approved *** I've said all along that if it were ever discovered how that contract was really approved, there'd be some vacant chairs in the city council *** There are just too many unanswered

questions in the contract. The whole thing was railroaded through, and we can't help but think there was some strong motivation behind it.'

\*\*\*

4. That the Defendant Pechous intended the persons who heard or read the above statements to believe that the Plaintiffs were bribed to vote to award the said contract to Clearing Disposal, Inc., and to believe that the Plaintiffs cast their votes solely for personal gain in violation of their fiduciary duty to the citizens of Berwyn and of their oaths of office and in violation of the law; and that the above statements were so understood by the persons who heard and read said statements."

Subsequent paragraphs of the complaint alleged that these statements were false, and that Pechous uttered them with knowledge that they were false or with reckless disregard as to their truth or falsity.

Count III, directed against Fineman and Field, alleged that in publishing the quoted statements these defendants did so knowing that the statements were false or with reckless disregard as to their truth or falsity. The article by Fineman is set out in its entirety as the appendix to this opinion. It was published in the May 12-13, 1976, edition of Suburban Week.

Pechous filed an answer denying each allegation of counts I and II. Fineman and Field filed an answer in which they admitted the publication of the article, but denied the other allegations of count III.

The only discovery had in this case was conducted by the plaintiffs, and it was limited to written interrogatories and notices to produce served on Pechous and Fineman. No admissions of fact were requested, and no depositions were taken by either side. The materials available for the court's consideration of the motions for summary judgment, other than the pleadings, consisted of answers to the interrogatories, documents produced, and affidavits by Fineman, Pechous, and four of the plaintiffs which were made in support of the motions for

summary judgment.

The pleadings left unresolved several issues of fact: whether Pechous, at the meeting of December 29, had made the statement alleged in paragraph 1 of the complaint; whether he had made the statement to Fineman alleged in paragraph 2; whether these statements were false; and whether Pechous had made them with knowledge of their falsity or with reckless disregard of their truth or falsity. The propriety of disposing of the action upon summary judgment thus turned on whether the additional information before the court eliminated all genuine issues of material fact, as all of the parties represented in their motions.

In addition to renewing the arguments which he had made in the circuit and the appellate courts that he was entitled to summary judgment, Pechous contends in this court that summary judgment for the plaintiffs was improper since there remained in the case a controversy over whether he made the statement before the council alleged in paragraph 1 of the complaint.

As the appellate court noted in a supplemental opinion, Pechous advanced the same claim in his petition for rehearing. He also sought leave to file an affidavit by Thomas P. Hardy, a reporter for another newspaper, and a copy of an article written by Hardy about the meeting of January 12, 1976, which he had attended. According to this article, Pechous had made a speech at this meeting questioning the legality of the award to Clearing in which he was quoted as referring to 240 pieces of silver, but in somewhat different language from that alleged in the complaint with regard to the December 29 meeting. He was reported to have said, "240 pieces of silver cemented the relationship between Clearing and the aldermen, destroying the tap roots of democracy." Hardy's affidavit did not state that he had attended the meeting of December 29, 1975. In denying leave to file the affidavit

and the article, the appellate court held that Pechous was improperly seeking to introduce new evidence for the first time on appeal. (69 Ill. App. 3d 797, 813.) This ruling of the court was plainly correct.

Elimination of the affidavit does not wholly dispose of Pechous' contention that summary judgment was improper, however, for in his answer Pechous denied having made the alleged statement regarding 240 pieces of silver at the December 29 council meeting. The complaint was not verified, and the plaintiffs filed no affidavit attesting to the truth of the allegation. It should be added that the minutes of the meeting recite that Pechous was excused on account of illness shortly after the meeting began and before the matter of the bids on the garbage collection contract had been reached. That circumstance does not of course rule out the possibility that Pechous may have remained in council chambers and made his quoted remark during the balance of the meeting.

As the appellate court pointed out in its supplemental opinion, neither in his briefs nor in oral argument did Pechous challenge either the accuracy of his quoted statement or the date when it was made. Moreover, the representation made in his motion for summary judgment that there were no genuine issues of material fact necessarily presupposed that a statement had been made as alleged in the complaint. That he had made his statement at a council meeting was also the necessary predicate for the claim made in his motion for summary judgment that his statement was protected by executive privilege and also for his claim that he had had no time in which to investigate the truth of the statement.

It is thus apparent that Pechous invited both the circuit and appellate courts to decide the case by summary judgment in the hope that the judgment would be in his favor, and that he sought to repudiate his statement only after the appellate court had rendered a judgment adverse

to him. Such a course of action is barred under the doctrines of invited error and of estoppel. *Cf. People v. Van De Rostyne* (1976), 63 Ill. 2d 364, 370; *People ex rel. Scoon v. Chicago & Alton R.R. Co.* (1911), 253 Ill. 191, 196-98.

Pechous' contention would not, in any event, preclude the award of summary judgment based on his statement to Fineman as alleged in paragraph 2 of the complaint, which includes the same remark about 240 pieces of silver changing hands, since Fineman's affidavit asserts that Pechous did make that statement. We conclude, therefore, that the entry of summary judgment was not rendered improper by any genuine controversy over the making of the statements complained of.

Although neither Pechous nor the other defendants make a point of it, the issue of whether his statements were false, as alleged in the complaint but denied by the answers, was likewise not eliminated by additional information arising out of discovery, and the plaintiffs filed no affidavits denying the receipt of consideration for the award of the contract.

*New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, holds that recovery for a defamatory statement concerning a public official may be allowed only if it is established both that the utterance was false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true. (*Garrison v. Louisiana* (1964), 379 U.S. 64, 74, 13 L. Ed. 2d 125, 132, 85 S. Ct. 209, 215; Restatement of Torts (Second), sec. 581A (1977).) A determination that the defendant made his statement with actual malice does not establish that the statement was in fact false. Restatement of Torts (Second), sec. 581A, comment *f.*

The parties do not discuss the question of truth or falsity in their briefs, and it is apparent that by moving

for summary judgments they elected to dispense with the necessity of resolving that question. We thus turn to the defendants' arguments on the merits, considering first the liability of Pechous.

Pechous contends that his statement was not defamatory; that even if defamatory it was protected by executive privilege; and that plaintiffs did not prove that his statements were made with actual malice, as that term is defined in *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710.

As to the claim of executive privilege, Pechous asserts that since the city clerk is an officer of the government of Berwyn, such a privilege attached to his remarks under the decision in *Blair v. Walker* (1976), 64 Ill. 2d 1. The appellate court properly rejected this claim because the ordinances of Berwyn showed that the city clerk's duties with respect to the award of the contract were ministerial only, and because an affidavit by one of the plaintiffs that Pechous had no part to play in that matter was not controverted by the affidavit filed by Pechous. 69 Ill. App. 3d 797, 806-07.

We agree with the reasoning of the appellate court on this issue, and we add only a comment in response to Pechous' observation that the council permitted him to address it on the subject of the award: Those minutes of council meetings which are included in the record indicate that the council did, on occasion, permit persons other than aldermen, including private citizens, to be heard on an issue under consideration. By following that practice the council, of course, did not and could not confer an executive privilege on Pechous or any other speaker.

In discussing Pechous' claim that his statements were not defamatory, a claim also made by the other defendants, we focus, as do the parties, upon his remark, "Two hundred forty pieces of silver changed hands—thirty for each alderman." (We note in passing that Pechous' state-

ment is erroneous in assuming that all eight aldermen voted to award the contract to Clearing. The minutes disclose that only seven aldermen attended the meeting of December 29, the same seven individuals who are the plaintiffs here.)

This remark was of course not made in a literal sense. As Pechous himself states in his motion for summary judgment, the allusion to Judas' betrayal of Christ was intended to convey the thought that the plaintiffs received something of value in exchange for voting to award the contract to Clearing, and had thereby betrayed the public trust. It is not important that the statement fails to charge the criminal offenses of bribery or official misconduct with the precision of an indictment (Ill. Rev. Stat. 1979, ch. 38, pars. 33–1, 33–3). The plaintiffs were accused of venality, and such a charge would be hurtful to them. *Zeinfeld v. Hayes Freight Lines, Inc.* (1968), 41 Ill. 2d 345, 348.

The defendants' argument is that Pechous' words may be given an additional meaning which is not defamatory. Their argument is based on this court's discussion in *John v. Tribune Co.* (1962), 24 Ill. 2d 437, 442, of a "rule of innocent construction." There the court said:

"That rule holds that the article is to be read as a whole and the words given their natural and obvious meaning, and requires that words allegedly libelous that are capable of being read innocently must be so read and declared nonactionable as a matter of law."

We need not, however, consider this argument, for the defendants do not suggest an alternative construction of Pechous' statement which is plausible.

In the form in which the complaint alleges that it was originally made, Pechous' statement had no verbal context; it stood in isolation. As for the interview with Fineman, Pechous repeated the statement and accompanied it with

several additional comments. It is questionable to begin with whether these additional comments, made several months after the council meeting and directed to a different audience, may be considered as providing a context for Pechous' earlier utterance. Be that as it may, Pechous' comments, by specifying the consideration for which the alleged bribe was given, seem to reinforce rather than to dissipate his original charge.

There is, in any event, no merit in the suggestion made by defendants Fineman and Field that Pechous' intended meaning was that the plaintiffs "were politically motivated in voting for the Clearing Disposal Contract" for the reason that "a political ally of the plaintiffs" [John Van Tholen, Jr.,] "went to work for the parent company of Clearing Disposal the month the contract was signed." This latter development had not even occurred when Pechous delivered his statement before the council.

In a related line of argument defendants Fineman and Field, quoting a portion of a *dictum* in *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 339-40, 41 L. Ed. 2d 789, 805, 94 S. Ct. 2997, 3006-07, assert that an expression of opinion can never be actionable. Therefore, they continue, if Pechous' communication may be construed either as a statement of fact or as an expression of opinion, the rule of innocent construction requires that it be treated as the latter. Pechous' words, it is said, must be taken as asserting only that the aldermen were "acting contrary to the public interest and out of political motives." We do not find that to be a fair reading of Pechous' words. To charge that the approval of the contract was procured by a bribe cannot fairly be transmuted into a criticism of the merits of the award of the contract.

A more candid explanation of what was meant by Pechous' words is furnished by Pechous himself in a different connection. In responding to the plaintiffs' claim that he made his statement with malice he makes the

following observation in his brief:

"In view of the circumstances of the Plaintiffs-Appellees' actions in railroading a contract through the City Council without competitive bids, without advance notice to bidders and contrary to the bidding schedule established prior to the December 29th meeting, and contrary to the law, it is not unreasonable, and certainly not reckless to conclude that there may have been a payoff."

So stated, the contention that Pechous' statement was not defamatory reduces to the claim that when a charge of crime is based only on an inference drawn by the speaker, it must be treated as no more than an expression of opinion and thus ceases to be defamatory. We do not believe that such a position is supported by the language from *Gertz* on which the defendants rely. The passage, in its entirety, reads:

"Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues. *New York Times Co. v. Sullivan*, 376 U.S., at 270." 418 U.S. 323, 339-40, 41 L. Ed. 2d 789, 805, 94 S. Ct. 2997, 3007.

The argument made here would give a defendant in a defamation suit an absolute immunity rather than the limited immunity conferred by *New York Times* on a person whose defamatory statement was made without actual malice.

The question whether an accusation of crime is a statement of fact or an expression of opinion was an issue in *Cianci v. New Times Publishing Co.* (2d Cir. 1980), 639 F.2d 54, a recent decision by the United States Court

of Appeals for the Second Circuit handed down on July 11, 1980.

The case concerned a newspaper article which stated that a former mayor of Providence, Rhode Island, then seeking reelection, had been accused some 12 years previously of committing a rape. The article reported that the victim had filed a criminal complaint, and it continued, "After receiving a $3,000 settlement, [the victim] dropped the charges." (639 F.2d 54, 56.) The defendants, the publisher and the editor of the newspaper and the author of the article, made a pretrial motion to stay discovery which the district court granted. The court of appeals reversed.

Evidence presented to the district court showed that the $3,000 paid to the victim by the plaintiff had been paid in settlement of a civil suit for damages which the victim had brought, and that the decision to drop the prosecution was made prior to and independently of the payment, as the defendants knew. As viewed by the court of appeals, the decision of the district court rested on its determination that the article did not state explicitly that the plaintiff had paid the $3,000 as part of an agreement to drop criminal charges, and that if there were any implications in the article that the plaintiff was guilty of rape or of making an improper payoff, those implications were " 'constitutionally protected as expressions of opinion.' " 639 F.2d 54, 59.

The court of appeals reached the contrary conclusion. On the basis of the decisions of the Supreme Court in *Greenbelt Cooperative Publishing Association v. Bresler* (1970), 398 U.S. 6, 26 L. Ed. 2d 6, 90 S. Ct. 1537, and *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin* (1974), 418 U.S. 264, 41 L. Ed. 2d 745, 94 S. Ct. 2770, its own decision in *Buckley v. Littell* (2d Cir. 1976), 539 F.2d 882, *cert. denied* (1977), 429 U.S. 1062, 50 L. Ed. 2d 777, 97 S. Ct. 785, and the decision of the Court of Appeals of New York

in *Rinaldi v. Holt, Rinehart & Winston, Inc.* (1977), 42 N.Y.2d 369, 366 N.E.2d 1299, 397 N.Y.S.2d 943, *cert. denied* (1977), 434 U.S. 969, 54 L. Ed. 2d 456, 98 S. Ct. 514, the court drew certain general principles and applied them to the case before it in the following words:

> "[A] pejorative statement of opinion concerning a public figure generally is constitutionally protected, quite apart from *Sullivan,* no matter how vigorously expressed; (2) that this principle applies even when the statement includes a term which could refer to criminal conduct if the term could not reasonably be so understood in context; but (3) that the principle does not cover a charge which could reasonably be understood as imputing specific criminal or other wrongful acts.
>
> It is clear from the foregoing that even if the article were to be read as only expressing the 'opinion' that Cianci committed the crimes of rape and obstruction of justice, it is not absolutely protected as distinguished from the protection afforded by *Sullivan.* The charges of rape and obstruction of justice were not employed in a 'loose, figurative sense' or as 'rhetorical hyperbole'." 639 F.2d 54, 64.

While there are differences between the facts in *Cianci* and those of the present case, we consider that the same conclusion should be reached here.

In *Greenbelt Cooperative Publishing Association v. Bresler,* referred to and distinguished in *Cianci,* the plaintiff, a real estate developer, was seeking zoning variances from the city of Greenbelt on land which he owned. At the same time the city was endeavoring to purchase other land owned by the plaintiff for a school site. In the negotiations with the city the plaintiff was conditioning the sale of his land upon a grant of the zoning variances. The defendant newspaper published an article describing a

public meeting of the city council in which it was correctly stated that some persons attending the meeting had characterized the plaintiff's position as "blackmail."

A judgment in the plaintiff's favor was reversed by the Supreme Court. One ground for the reversal was that the use of the word "blackmail" did not charge the plaintiff with the commission of that crime, since "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable." (398 U.S. 6, 14, 26 L. Ed. 2d 6, 15, 90 S. Ct. 1537, 1542.) As the court of appeals noted in *Cianci* (639 F.2d 54, 64), the clear implication of the opinion was that an accusation of actual wrongdoing would have been held actionable. There is a crucial difference between *Greenbelt* and the present case: In *Greenbelt* the word "blackmail" was used to convey the speaker's negative evaluation of conduct by the plaintiff which was known to both the speaker and his audience. In the case before us Pechous' charge of bribery, while of course it evidences his disapproval of the award of the contract, also informs his audience that a criminal act of which the audience was unaware has been committed by the aldermen.

In *Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin* (1974), 418 U.S. 264, 41 L. Ed. 2d 745, 94 S. Ct. 2770, an article in a union newsletter referred to persons who had not joined the union as scabs and quoted a well-known author's definition of a scab which characterized a scab as being, among other things, a "traitor to his country." Since the term "scab" has the common meaning of one who refuses to join a union, the Supreme Court, following *Greenbelt,* held that no reader could have understood its use to have amounted to a charge of treason. 418 U.S. 264, 283-86, 41 L. Ed. 2d 745, 761-63, 94 S. Ct. 2770, 2781-82.

In *Buckley v. Littell* (2d Cir. 1976), 539 F.2d 882, a statement was made in the defendant's book that the plaintiff was a "fellow traveler of fascists." The court held that that statement could not be treated as defamatory because the terms used were so imprecise as to make it impossible to prove the assertion false. A further assertion by the defendant that the plaintiff had made libellous statements about other persons, however, was held to be a statement of fact and therefore actionable. 539 F.2d 882, 895-96.

*Rinaldi v. Holt, Rinehart & Winston, Inc.* (1977), 42 N.Y.2d 369, 366 N.E.2d 1299, 397 N.Y.S.2d 943, was a defamation suit brought by a trial judge over published assertions that his sentences in certain named criminal cases showed that he was "incompetent," "probably corrupt," and "suspiciously lenient." The court of appeals held that the assertion that the plaintiff was incompetent was a constitutionally protected expression of opinion, but that the other assertions were not. The court stated:

"Newfield's assertions that plaintiff is 'probably corrupt' and that his sentences of certain defendants were suspiciously lenient, with their strong undertones of conspiracy and illegality, rest on a different footing than his opinions as to plaintiff's judicial performance. These words were not used merely in a 'loose, figurative sense' to demonstrate Newfield's strong disagreement with some of plaintiff's dispositions. [Citations.] The ordinary and average reader would likely understand the use of these words, in the context of the entire article, as meaning that plaintiff had committed illegal and unethical actions. Accusations of criminal activity, even in the form of opinion, are not constitutionally protected." 42 N.Y.2d 369, 381-82, 366 N.E.2d 1299, 1307, 397 N.Y.S.2d 943, 951.

To summarize our decision on this branch of the case, we hold that Pechous' statements "Two hundred forty pieces of silver changed hands—thirty for each alderman" and "I think two hundred forty pieces of silver changed hands—thirty for each alderman," as made before the council and in his interview with Fineman, respectively, charged that the plaintiffs were paid a bribe for awarding the garbage-collection contract to Clearing; that the statement was defamatory; that it was not capable of an alternative reading which would render it nondefamatory; that it was a statement of fact and not the constitutionally protected expression of an opinion; and that it was not protected by executive privilege.

The remaining question regarding Pechous' liability is whether he made his statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 280, 11 L. Ed. 2d 686, 706, 84 S. Ct. 710, 726.

The materials before the trial court included Pechous' answers to interrogatories. One interrogatory asked him to detail any investigation he made of the circumstances of the awarding of the contract, and to describe any information produced by his investigation. Pechous' answer was: "No formal investigation. However, the Minutes of December 29, 1975, indicate substantial deviations from prescribed municipal contracting procedure." His answer identified seven paragraphs of the minutes to which reference was made.

Another interrogatory asked him to specify the factual basis on which he had made each of the statements quoted in the newspaper article. To this Pechous answered: "See above and documents submitted." A third interrogatory stated: "Specify any personal knowledge you have that when said contract was so awarded '240 pieces of silver changed hands—30 for each alderman.' " The interrogatory

further requested Pechous, if he did not have such personal knowledge, to "specify any other evidence you have which would support your said statement." The same interrogatory was asked regarding each of the other statements quoted in the article. To each of these interrogatories Pechous responded, "See above and documents submitted." The documents submitted included minutes of various meetings of the council and other material not described in the affidavit. It appears from Pechous' brief, however, that they consisted of letters to the council from the mayor and the city attorney, and other public documents relating to the contract.

From the answers to interrogatories, which operate as admissions (73 Ill. 2d Rules 212(a)(2), 213(f)), we must conclude that Pechous had no personal knowledge of the alleged act of bribery, that he had not been informed of it by another person, and that he had no documentary evidence of it. We must also conclude that Pechous did not attempt to verify his statement by an inquiry directed to any of the aldermen or to persons associated with Clearing.

Finally there was an affidavit by Pechous attached to his motion for summary judgment which stated: "[A]ffiant did not act with malice in making the comments he did because his own brother was one of the aldermen being criticized by affiant." (The minutes of the December 29, 1975, meeting recite that Alderman Pechous, the defendant's brother, was not present.)

In the *New York Times* line of cases the reckless disregard for the truth which is requisite to a proof of malice is described in subjective terms: Recklessness is said to exist only where a defendant "in fact entertained serious doubts as to the truth of his publication" (*St. Amant v. Thompson* (1968), 390 U.S. 727, 731, 20 L. Ed. 2d 262, 267, 88 S. Ct. 1323, 1325) or where he had a "high degree of awareness of *** probable falsity" (*Garrison v. Louisiana* (1964), 379 U.S. 64, 74, 13 L. Ed. 2d 125, 133, 85

S. Ct. 209, 216; *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 335 n.6, 41 L. Ed. 2d 789, 802-03 n.6, 94 S. Ct. 2997, 3004 n.6; *cf. Curtis Publishing Co. v. Butts* (1967), 388 U.S. 130, 153, 18 L. Ed. 2d 1094, 1110, 87 S. Ct. 1975, 1990).

With a few exceptions (see *Cantrell v. Forest City Publishing Co.* (1974), 419 U.S. 245, 42 L. Ed. 2d 419, 95 S. Ct. 465; *Time, Inc. v. Hill* (1967), 385 U.S. 374, 17 L. Ed. 2d 456, 87 S. Ct. 534; *Ocala Star-Banner Co. v. Damron* (1971), 401 U.S. 295, 28 L. Ed. 2d 57, 91 S. Ct. 628), the cases before the Supreme Court involving the *New York Times* rule have been primarily concerned with the liability of a defendant, often a newspaper, for reporting a defamatory statement made by another person, and the court's discussion of malice has taken place in that context.

Here, however, we are concerned with a defendant who was, as his answers to interrogatories show, the original source of the defamatory statement. The basis for his charge of bribery, according to his brief, was only an inference which he drew from what he considered to be the precipitous manner in which the award was made. As the defendants Fineman and Field observe in their brief, bribery was not the only thing which could have been inferred as the cause of the award. Political motivations, such as a desire by the aldermen to remove patronage jobs from the mayor's control, could also have been the explanation. Pechous made no inquiry to ascertain whether it was his inference rather than another which was the correct one to draw.

Under these circumstances Pechous' statement, if not indeed a "calculated falsehood," was, at the least, made with reckless disregard of whether it was true. (See *Cantrell v. Forest City Publishing Co.* (1974), 419 U.S. 245, 253-54, 42 L. Ed. 2d 419, 427-28, 95 S. Ct. 465, 470-71.) His affidavit did not unqualifiedly declare that he

believed his statement to be true. Even if it had done so, we question whether it would negate the showing of actual malice. As the Supreme Court said in *St. Amant v. Thompson* (1968), 390 U.S. 727, 732, 20 L. Ed. 2d 262, 267-68, 88 S. Ct. 1323, 1326:

"The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call."

We therefore affirm the decision of the appellate court with respect to Pechous.

With respect to defendants Fineman and Field there remain for consideration two questions not already disposed of. The first of these is whether the newspaper article involved was privileged as a report of governmental proceedings, a question which the appellate court answered in the affirmative.

The defendants rely principally on *Lulay v. Peoria Journal-Star* (1966), 34 Ill. 2d 112. That case dealt with a statement made in a government report rather than a statement made at a meeting of a governmental body, but the court, following section 611 of the Restatement of Torts, (1938), stated that a privilege to report government proceedings existed. 34 Ill. 2d 112, 115.

Under section 611, as it then read, the privilege was defeasible if the statement was made with malice, in the common law sense of the term. When *Lulay* was decided that limitation had of course been rendered obsolete by *New York Times Co. v. Sullivan*. Section 611 of the

Restatement (Second) of Torts (1977) now reads:

> Sec. 611. Report of Official Proceeding or Public Meeting
>
> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

Comment *a* to the section states that the privilege is lost if the report is not accurate, but the plaintiffs raise no question on that score. They do point out, however, that Fineman did not attend the council meeting, that the article was not published until five months later, that its report of the meeting was based on the account given by Pechous, and that not all of the statements by Pechous which appear in the article were made at the meeting. These points raise questions not addressed in *Lulay*. We need not decide them, however, for we hold that actual malice on the part of these defendants has not been shown.

At common law a person who republished a defamatory statement made by another was himself liable for defamation even though he gave the name of the originator (Restatement of Torts sec. 578 (1938)). Although the absolute liability which attached to defamation at common law was supplanted as to public officials and public figures by *New York Times Co. v. Sullivan* and its sequels, the republisher of a defamatory statement made by another remains subject to liability (Restatement (Second) of Torts sec. 578 (1977)), but he cannot be held liable unless he himself knew at the time when the statement was published that it was false, or acted in reckless disregard of its truth or falsity. It is not sufficient that the originator of the statement made it with actual malice. Our holding that Pechous is liable is therefore not dispositive as to the liability of the other defendants.

As noted previously in this opinion, the United States Supreme Court has equated reckless disregard of the truth with subjective awareness of falsity or probable falsity (*St. Amant v. Thompson* (1968), 390 U.S. 727, 731, 20 L. Ed. 2d 262, 267, 88 S. Ct. 1323, 1325), and in his affidavit Fineman stated that at no time did he believe that any statement in his article was false. The plaintiffs seek to impeach the affidavit by Fineman's statement in his answers to interrogatories that each alderman had denied taking a payoff for the award of the contract. We do not consider, however, that a denial by one who is charged with having committed a criminal act would necessarily lead a reporter to doubt the truth of the charge. (*Edwards v. National Audubon Society, Inc.* (2d Cir. 1977), 556 F.2d 113, *cert. denied* (1977), 434 U.S. 1002, 54 L. Ed. 2d 498, 98 S. Ct. 647.) That Fineman's investigation did not yield any facts which would have confirmed Pechous' charge is also, for similar reasons, without significance.

The plaintiffs point to the following words that appear in Fineman's handwritten notes of the interviews which he made in the course of his investigation: "Strongly feel $ has changed hands instinctive feeling." At the top of the page immediately preceding that on which the quoted words appear are the words "Bob Pechous," and the plaintiffs would have us interpret the quotation as representing something said to Fineman by Pechous. Such a comment, they argue, should have made Fineman aware that Pechous had no factual basis for his defamatory statement.

We cannot accept the premise of the plaintiffs' argument. Fineman's notes are not a verbatim transcript of his interviews, but only rough notes, many of them indecipherable, taken during his interviews. It is not possible from the notes alone to identify an item as a statement made by the interviewee as opposed to what

may be a question or a supposition in the mind of Fineman. The notes do not speak for themselves. Without extrinsic evidence, the plaintiffs cannot establish the import of the quoted words or the accuracy of their transcription.

We are reminded that the proof that Fineman doubted the truth of Pechous' defamatory statement must be made with "convincing clarity." (*Rosenblum v. Metromedia, Inc.* (1971), 403 U.S. 29, 55, 29 L. Ed. 2d 296, 318, 91 S. Ct. 1811, 1825.) The plaintiffs' evidence falls far short of that standard.

Our opinion is not to be taken as intimating that the conclusion we reach would be the same had it been shown, by way of depositions, answers to interrogatories, admissions, or affidavits, that Pechous had told Fineman that his charge of bribery was prompted by "instinct" alone and that he had no evidence to support it. Notwithstanding Fineman's affidavit that he did not doubt the truth of his article, in the case supposed it might be concluded that Fineman had not made the affidavit in good faith. *St. Amant v. Thompson* (1968), 390 U.S. 727, 732, 20 L. Ed. 2d 262, 267-68, 88 S. Ct. 1323, 1326.

We think it is also appropriate to state that in holding that Pechous is liable and that the other defendants are not, we are not, as the plaintiffs assert, applying different standards, and we are not indicating approval of the position taken by the court in *Edwards v. National Audubon Society, Inc.* (2d Cir. 1977), 556 F.2d 113, *cert. denied* (1977), 434 U.S. 1002, 54 L. Ed. 2d 498, 98 S. Ct. 647, that a newspaper, under some circumstances, is protected against liability in reporting a defamatory statement about a public official or public figure even if the newspaper knew that the statement was false. *Cf. Dickey v. CBS, Inc.* (3d Cir. 1978), 583 F.2d 1221, 1225.

For the reasons given in this opinion the judgment of the appellate court is affirmed.

*Judgment affirmed.*

## APPENDIX

## "BERWYN TRASH PACT RAISES STINK

### By Mark Fineman

The City of Berwyn's recently awarded and highly controversial municipal garbage contract, like others in the suburbs, was approved amid strong charges and counter-charges.

'Something smells in this contract more than garbage,' charged City Clerk Robert C. Pechous, who opposed the city council's decision last December to scrap Berwyn's municipal residential-garbage service and contract with a private scavenger.

'I said at the council meeting when the contract was first awarded that I think 240 pieces of silver changed hands—30 for each alderman,' Pechous added. 'There was just something suspicious about the way that contract was approved.'

Berwyn's eight aldermen claim Pechous' statements are politically motivated. (Pechous, a candidate for state representative in the 7th District, is a Democrat. All but one of the aldermen are Republicans.)

When contacted by Suburban Week, all the aldermen vehemently denied taking payoffs. One alderman read a two-page statement denying the allegations at a recent city-council meeting. And several aldermen have threatened to sue Pechous over his charges.

But a Suburban Week investigation of the awarding of the contract indicates that a close political ally of the aldermen, John Van Tholen, Jr., who publicly supported awarding the contract to Clearing Disposal Co., a subsidiary of Waste Management Inc., was given a high-level WMI position shortly after the council approved the Clearing contract.

Van Tholen and several of the alderman are active members of the Berwyn Regular Republican Organization. He was once appointed Berwyn streets superintendent by the city council, but that appointment was later nullified in Cook County Circuit Court. Van Tholen was hired by WMI in January just after the contract was awarded.

At least one inside industry source claims the WMI job 'was a reward for having made sure the Berwyn contract

was given to Clearing.'

Van Tholen denied the charges.

'I had nothing to do with it (the awarding of the contract). The night they were deciding on the contract, I went up to John DeBoer (a WMI representative) and asked if there would be a job open at Clearing,' claimed Van Tholen, who owned his own scavenger business for 28 years. 'That was it. As far as I know, that job wasn't a reward at all.'

Most of the aldermen have admitted they are friends of Van Tholen's, but all denied that Van Tholen influenced their decision to award the contract to Clearing.

'I've known John Van Tholen for years and years. He lives in my ward,' said Ald. Raymond G. Cox, the only non-Republican on the city council. 'But that didn't enter into it at all. This contract is saving the people of Berwyn money. That's the only reason we approved it. Friendship wasn't involved.'

But there were other suspicious circumstances surrounding the awarding of the contract, according to an industry source.

Bidding against Clearing Disposal on the contract was a Berwyn-based scavenger firm, the C. Groot Automatic Disposal Co. According to Securities and Exchange Commission documents, the Groot firm is owned by John C. Groot, a WMI stockholder and one of WMI's eight founders.

A WMI spokesman confirmed that Groot is a stockholder in WMI, but he said WMI is in no way connected to the Groot firm.

However, at least one industry source claimed the Groot firm's bid of $3.55 a month for each Berwyn family was never intended to be competitive against Clearing's bid of $3.15 per family. The only other bid received at that time was from Van Der Molen Disposal Co., a subsidiary of Browning Ferris Industries. That firm's bid was $3.20.

Those bids on the initial garbage contract, awarded last Dec. 29, were later thrown out by Circuit Court Judge Francis Delaney after both Berwyn Democratic administration officials and another private scavenger firm filed suit against the aldermen.

Delaney ordered the aldermen to readvertise for bids

and approve a second contract. Clearing Disposal's second bid was still lowest and it received the existing contract last February.

Some Berwyn officials have said they're considering turning over information on the awarding of the contract to federal authorities.

'I've said all along that if it were ever discovered how that contract was really approved, there'd be some vacant chairs in the city council,' charged City Clerk Pechous. 'There are just too many unanswered questions in the contract. The whole thing was railroaded through, and we can't help but think there was some stronger motivation behind it.' "

MR. JUSTICE CLARK, concurring in part and dissenting in part:

I have concluded that the fair-comment privilege should protect the statements complained of. If the statements should not be so protected, however, I have concluded that the majority has misapplied both our own standard for summary judgments and the actual-malice standard of *New York Times.*

Plaintiffs' unverified complaint was filed on June 28, 1976. Pechous' answer was filed on July 30 of that year. Defendants Fineman and Field moved for summary judgment on October 26, 1976. Plaintiffs' reply and cross-motion for summary judgment was filed May 31, 1977. The trial court granted defendants' motion and denied plaintiffs' cross-motion on June 9, 1977. The relevant portion of the trial court's order was as follows:

"1. The statements by Defendant Pechous which appear in the article do not fall within the scope of Lulay v. Peoria Journal-Star, Inc., 34 Ill. 2d 112, and related cases or within the scope of Blair v. Walker, 64 Ill. 2d 1 and related cases.

2. Their [*sic*] is a question of fact about whether Defendants Fineman and Field Enterprises, Inc. published the article in question with actual malice as defined in New

York Times Company v. Sullivan, 376 U.S. 254 and related cases.

    3. Application of the 'innocent construction' rule of John v. Tribune Co., 24 Ill. 2d 437 renders the statements in the article non-actionable against Defendants Fineman and Field Enterprises, Inc.''

Defendant Pechous then moved, on July 18, 1977, for summary judgment on grounds that his statement expressed an opinion, on grounds that his statement could be innocently construed, and on grounds that the court had already dismissed the other defendants. Plaintiff's reply and cross-motion argued that defendant's statement was libelous *per se,* that it could not be construed innocently, that the trial court's ruling as to Fineman and Field was not binding as to Pechous, and that Pechous' statement was made with actual malice.

The actual-malice argument of the plaintiffs was premised upon Pechous' alleged failure to provide facts supporting a charge of bribery and that "[n]othing in any other document submitted by defendant Pechous pursuant to plaintiffs [*sic*] interrogatories and request provides any basis for said Defendant's accusation against Plaintiffs." The trial court, on September 22, 1977, granted defendant's summary judgment motion solely on the basis of the innocent-construction rule and did not rule on whether there was a question of fact about defendant's alleged actual malice.

The facts submitted and argued to the trial court and deemed relevant by all sides included primarily documents submitted by Pechous in response to plaintiffs' interrogatories. Included among these documents were the minutes of the December 29, 1975, council meeting, commented upon only briefly by the majority. The minutes show that Pechous' brother was absent. Item 1B of the minutes, located prior to any consideration of the garbage contract, states:

    "The City Clerk requested that he be excused because

> he is ill and thereupon a motion by Alderman Cox, sec-
> onded by Alderman Catalano was made designating the
> Comptroller be Clerk Pro-Tem for this meeting. On a voice
> vote the Mayor declared MOTION CARRIED."

Pechous' signature is affixed below this item. The minutes of this meeting show, moreover, the name of each person who spoke on the question of the garbage contract, including the names of private citizens and city officials speaking as private citizens. Defendant Pechous' name does not appear in the minutes after he was listed as excused on account of illness.

The minutes also reveal that the council decided to open the sealed bids only of those companies represented at the meeting. After a short recess, the aldermen declared that an emergency necessitated an appropriation of $600,000 for a private-scavenger-service contract for 1976. A second motion was then passed to accept the bid of Clearing Disposal, Inc., and providing that "such contract be awarded without the necessity of advertising for competitive bids." Two motions were also passed to reduce the employment status and salary of the commissioner of public works and the city attorney. Both of these individuals opposed the move to a private scavenger service. The minutes disclose, too, that John Van Tholen, Jr., spoke at the meeting just prior to the adoption of motions to accept the bid of Clearing Disposal, Inc.

The other documents submitted on the record by Pechous and which the plaintiffs, by the excerpt of their summary judgment motion quoted above, admitted to the trial court were relevant, reveal that Pechous was not the only city official "imagining" improprieties. The mayor vetoed the motions passed at the December 29 meeting. His message, dated January 5, 1976, stated in part:

> "The worst act of deceit was that practiced by the
> Public Works Committee. At their 7:00 o'clock Committee
> meeting on December 29, 1975, there was a discussion of
> the pros and cons of awarding a private scavenger contract,

but the meeting was adjourned with the private scavenger operators present (except three favored firms who just happened to remain after the Committee meeting) assuming that the Council would consider the sealed bids submitted as a result of the advertisement as required by law and to be opened on January 12, 1976. Why didn't Alderman Clifford tell all the prospective bidders to remain? Why didn't all prospective bidders have an equal chance to receive the contract? It wasn't a spur of the moment decision to award a contract last Monday. The Aldermen all had been primed in advance. Alderman Clifford had the statutory provisions they relied on written out. Alderman Slawko and Alderman Catalano quoted liberally from them during discussions on the Council floor.

You must have met secretly somewhere before the meeting—why don't you let the citizens in on your plans? What was the need for secrecy? Were you planning the strategy so you could selectively award the contract? Were you afraid the people would object? What was your rush?"

In a separate message sent on the same day, the mayor explained that the city council's action violated section 8–1–6 of the Illinois Municipal Code. A third message from the mayor explained his veto of the motions to reduce the employment status and salaries of the commissioner of public works and the city attorney in these words:

"The City Council's actions are also an obviously vindictive attempt to force fine and dedicated public officers to resign because of the large salary cuts involved. *** Lastly, however, and a far greater reason for my vetoes, is the fact that this series of Ordinances and Resolutions are directly contrary to the Decrees of Judge Arthur Dunne and the injunctive orders he has issued in connection with the Council's attempts to effect [sic] these very City offices."

The city attorney, in a separate message also dated January 5, 1977, advised the council:

"[I]n my legal opinion, the declaration of an emergency as articulated by you is inadequate and your actions last week in declaring an emergency are illegal.

The validity of this contract lies, of course, on the validity of your actions last week. You violated the bidding laws by a spurious declaration of emergency when none apparently then existed. By so doing you have opened the City to claims by private scavenger firms who were not favored by being included in the private bidding engaged in last week."

Thus, not only was the original award of the contract declared illegal, as noted in the article at issue and uncontroverted by plaintiffs, but as the latter messages indicate (and their accuracy was not challenged) additional illegalities and improprieties were perpetrated by the city council.

Applying the actual-malice standard, the "pleadings left unresolved several issues of fact: whether Pechous, at the meeting of December 29, had made the statement alleged in paragraph 1 of the complaint; whether he had made the statement to Fineman alleged in paragraph 2; whether these statements were false; and whether Pechous had made them with knowledge of their falsity or with reckless disregard of their truth or falsity." (83 Ill. 2d at 153.) To grant plaintiffs' motion for summary judgment against Pechous, all of these issues would have to be resolved against him. The inquiry should be undertaken, as the majority purports to do, without consideration of the affidavit of Thomas P. Hardy.

The majority argues that Pechous must be considered to have made his remarks on December 29 because he is repudiating the date of the statement only after an adverse judgment, a course of action barred by *People v. Van De Rostyne* (1976), 63 Ill. 2d 364, 370, and *People ex rel. Scoon v. Chicago & Alton R.R. Co.* (1911), 253 Ill. 191, 196-98. I find these cases inapposite. In *Van De Rostyne*, the court noted that "the action of the trial court resulted from the error of the defendant in mislabeling his motion, and he should not now be permitted to profit by that error." (63 Ill. 2d 364, 370.) In *Chicago & Alton R.R. Co.*,

one of the parties attempted to submit new information, after the court's decision, which was contrary to the statement of the case provided in the briefs and arguments.

In the instant case, in contrast, Pechous filed an answer which denied every factual allegation of the plaintiffs' complaint. By moving for summary judgment on the basis of the innocent-construction rule, Pechous might be considered to have admitted that he made the statement alleged in the complaint, but he did not thereby indicate that he made the statement on December 29. The innocent-construction rule renders immaterial any inquiry as to a defendant's actual malice and any consideration of when the statement was made. By contending that there was "no genuine issue as to any *material* fact \*\*\*" (emphasis added) (Ill. Rev. Stat. 1977, ch. 110, par. 57(3)), on the bases he argued, he was not contravening his answer's denial of the other allegations in the complaint.

In *Carruthers v. B. C. Christopher & Co.* (1974), 57 Ill. 2d 376, 380, this court said that "[e]ven though a complaint and answer may purport to raise issues of material fact, if such issues are not further supported by evidentiary facts through affidavits or such, summary judgment is then appropriate. [Citation.] *If* the party moving for summary judgment supplies facts which, if not contradicted, would entitle such a party to a judgment as a matter of law, the opposing party cannot rely upon his complaint or answer alone to raise genuine issues of material fact." (Emphasis added.) In this case, the plaintiffs have been granted summary judgment against Pechous on the basis of a statement alleged in an unverified complaint to have been made on December 29, without supporting that allegation with a single evidentiary fact, *i.e.*, without supplying an evidentiary fact which would entitle them to a judgment as a matter of law. The plaintiffs have relied upon their unverified complaint to do more than raise an issue of material fact; they have won a judgment on that

basis. Therefore, the validity of *Carruthers* is open to question.

Waiver and estoppel, moreover, are double-edged swords. Plaintiffs admitted in the trial court that Pechous' statements could be considered with reference to the documents he submitted in response to plaintiffs' interrogatories. Many of these documents existed only after the December 29 meeting, and plaintiffs never challenged their relevance in the court on this basis. Generally issues not presented to the trial court cannot be presented for the first time on appeal. (*People ex rel. Wilcox v. Equity Funding Life Insurance Co.* (1975), 61 Ill. 2d 303, 313; *Kraus v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 147; *Little Sister Coal Corp. v. Dawson* (1970), 45 Ill. 2d 342, 349.) Had the plaintiffs in the trial court relied upon an allegation that Pechous had no knowledge of the circumstances indicated in the messages of the mayor and city attorney, Pechous would then have had an opportunity to contravene that argument in the trial court, by denying the allegation, by submitting additional evidence, or by pointing out the evidence which was properly in the record and which indicated that he could not have made his statement on December 29. The plaintiffs have illegitimately prejudiced Pechous by waiting until the case was on appeal to argue that the documents Pechous submitted in response to interrogatories were irrelevant to the statement alleged in the first paragraph of the complaint. We should not selectively apply the doctrines of waiver and estoppel; the case should remain as the parties shaped it in the trial court.

Thus, Pechous did not *erroneously* assume that "all eight aldermen voted to award the contract * * *" or *mistakenly* say that his brother was a subject of his critical remarks. He correctly assumed all eight aldermen voted to award the contract and correctly included his brother as a subject of his remarks, because they were made at a meet-

ing when his brother was present.

Even if it were beyond dispute that Pechous first made his statement on December 29, it does not follow that it was made with actual malice as a matter of law. Professor Laycock, one of the reporters to the Committee on Motion Practice of the Illinois Judicial Conference, in an article expressing his own views, has explained that in a summary judgment motion the movant concedes that well-alleged facts "submitted in opposition are true." He continues:

> "[S]imilarly, well-alleged facts submitted in support of the motion are taken as true unless contradicted by well-alleged facts. However, affidavits supporting the motion are strictly construed, whereas affidavits opposing the motion are liberally construed. An oft-stated but incorrect assumption is that both sides' affidavits must be construed strictly. In reality, the rules are stacked against the movant, who must show beyond doubt that he is entitled to judgment.
>
> Even if the physical facts are completely undisputed, there may be a triable dispute over the characterization of those facts, or the inferences to be drawn therefrom. Moreover, characterization of the facts may depend on nuances and details not easily developed by affidavit. Thus, it is rarely possible to grant summary judgment on certain issues, for example, negligence. \*\*\* Similarly, questions of motive, intent, or subjective feelings are rarely appropriate for summary judgment. \*\*\* If the affidavits and other materials disclose a genuinely disputed material issue, summary judgment must be denied no matter how likely the court thinks it is that the movant will win at trial. Summary judgment cannot be used to try the disputed issue.
>
> \* \* \*
>
> A commonly heard statement is that when both sides move for summary judgment, they agree that only a question of law is involved. This is not always true, e.g., if the motions are unrelated, as where plaintiff moves for summary judgment on the merits and defendant moves for summary judgment on the ground that plaintiff lacks standing. In any event, the parties' agreement is not binding on the court; it may deny both motions if it finds a material

issue of fact. The normal standards are to be applied to each motion, and they should be considered independently. All the affidavits may be considered on both motions, but those that are strictly construed with respect to one motion will be liberally construed with respect to the other, and vice versa." (Laycock, *Dispositive Pre-Trial Motions in Illinois—Sections 45, 48 and 57 of the Civil Practice Act,* 9 Loy. Chi. L. Rev. 823, 848-51 (1978).)

The United States Supreme Court has twice recently reminded us that "proof of 'actual malice' calls a defendant's state of mind into question [citation] and does not readily lend itself to summary disposition." (*Hutchinson v. Proxmire* (1979), 443 U.S. 111, 120 n.9, 61 L. Ed. 2d 411, 422 n.9, 99 S. Ct. 2675, 2680 n.9; *Wolston v. Reader's Digest Association, Inc.* (1979), 443 U.S. 157, 161 n.3, 61 L. Ed. 2d 450, 456 n.3, 99 S. Ct. 2701, 2704 n.3.

This court has noted previously "the movement away from objective standards of reasonable or reckless conduct, and toward an emphasis upon the subjective frame of mind of the actor, which has characterized the development of the new constitutional common law of libel." (*Tunnell v. Edwardsville Intelligencer, Inc.* (1969), 43 Ill. 2d 239, 247.) Pechous, in an affidavit based upon his personal knowledge, denied that his statement was made with actual malice. The credibility of that denial is a disputed issue here, and the plaintiffs have the burden of proving that denial incredible. Such an issue should be resolved by a fact finder who can judge Pechous' demeanor and his contentions as tested by cross-examination at trial. The majority opinion contravenes the formerly well-settled principle that "[t]he court cannot determine the truth of defendant's affidavit of merits in a summary judgment proceeding." *Diversey Liquidating Corp. v. Neunkirchen* (1939), 370 Ill. 523, 530; see also *Zeinfeld v. Hayes Freight Lines, Inc.* (1968), 41 Ill. 2d 345; *Ray v. City of Chicago* (1960), 19 Ill. 2d 593; *Pilson v. Roush* (1980), 82

Ill. App. 3d 187.) And the *St. Amant* case (*St. Amant v. Thompson* (1968), 390 U.S. 727, 732, 20 L. Ed. 2d 262, 267-68, 88 S. Ct. 1323, 1326), cited by the majority in support of its holding, does not support the grant of summary judgment here. The court there said the "[p] rofessions of good faith will be unlikely to prove persuasive, for example, where a story is [fabricated, imagined or based on an anonymous, unverified telephone call] ." (*St. Amant v. Thompson* (1968), 390 U.S. 727, 732, 20 L. Ed. 2d 262, 267-68, 88 S. Ct. 1322, 1326.) The court did not rule out the possibility, however, that a "finder of fact" would be persuaded under those circumstances of a defendant's good faith; the court was clearly discussing permissive inferences which a trier of fact might or might not choose to draw.

Nor are the circumstances discussed in *St. Amant* necessarily present here.

One reason for this latter belief is the majority's distorted construction of Pechous' answers to plaintiffs' interrogatories. Plaintiffs never even asked Pechous in the interrogatories about the alleged December 29 statement. The precise interrogatory about his investigation was:

"1. With reference to an article, entitled Berwyn Trash Pact Raises Stink, written by Mark Fineman and published in the May 12-13, 1976 edition of *Suburban Week,* a publication of Field Enterprises, Inc., a copy of which is attached to the complaint herein as Exhibit A:

    a. \*\*\*

    b. Detail any investigation you made of the circcumstances of the awarding of said contract."

Pechous' answer, that he conducted "[n]o formal investigation," is an understandable response to this question. He had no power to convene a grand jury or to deploy investigators on this case. In interrogatory 1(c) he detailed the information he provided to defendant Fineman, which included previously discussed information like the minutes of the December 29 meeting, the mayor's veto, the motion

to override the veto, the city attorney's communication, and also (1) the minutes of the January 5 and January 12 meetings, which indicated that the council voted to reject unopened the bid of SCA Services, Inc., on the very date they had previously set for the submission of all bids, (2) a telegram from SCA declaring unlawful the award of the contract to Clearing Disposal, Inc., and indicating that the council's actions might be referred to the U.S. Attorney's office, and (3) the information that John Van Tholen, Jr., had been hired by Clearing Disposal, Inc. His answer that no formal investigation had been undertaken must be considered insignificant in comparison to the information he had collected and turned over to the reporter.

If the "no formal investigation" answer is combined with the erroneous assumption that he made his initial statement on December 29, the picture painted is one of irresponsibility. I find this picture inaccurate because the answer in context reveals that he did take substantial measures to collect relevant and damning information before talking to the reporter and because the information collected was, as plaintiffs conceded in the trial court, available to Pechous when he first made his statement.

I also consider that the majority has misinterpreted the meaning of Pechous' communication. I cannot conclude, because of the ambiguity surrounding the initial date of his statement, that John Van Tholen, Jr., had not been hired by the parent company of Clearing Disposal when Pechous first made his statement. Pechous' statement, in my view, could be understood to have imputed that a *quid pro quo* took place, a "singularly imprecise" but nonactionable characterization of the relation between John Van Tholen, Jr., the aldermen and Clearing Disposal. See *Tunnell v. Edwardsville Intelligencer, Inc.* (1969), 43 Ill. 2d 239, 246-47.

I note in passing that the majority, in its discussion of Pechous' intended meaning, has forgone an opportunity to

clear up the confusion over the innocent-construction rule. The rule has been inconsistently applied and recently ignored in this court. (Compare *Coursey v. Greater Niles Township Publishing Corp.* (1968), 40 Ill. 2d 257, and *Valentine v. North American Co.* (1974), 60 Ill. 2d 168, which purport to apply the rule, with *Suchomel v. Suburban Life Newspaper, Inc.* (1968), 40 Ill. 2d 32, *Tunnell v. Edwardsville Intelligencer, Inc.* (1969), 43 Ill. 2d 239, and *Troman v. Wood* (1975), 62 Ill. 2d 184, which do not apply the rule.) Nor can the standard announced in *Troman* (62 Ill. 2d 184) be reconciled with the standard announced in *John v. Tribune Co.* (1962), 24 Ill. 2d 437. If the disregard of *stare decisis* among judges of appellate courts is problematical (see Schaefer, *Forward: Stare Decisis and the "Law of the Circuit,"* 28 De Paul L. Rev. 565 (1979); Mattis and Yalowitz, *Stare Decisis Among* [*sic*] *the Appellate Court of Illinois,* 28 De Paul L. Rev. 571 (1979)), surely it is intolerable to have the innocent-construction rule consistently applied in the circuit courts and the appellate courts while it is ignored in this court.

I think, in sum, that as to Pechous, assuming that the actual-malice standard is applicable, either summary judgment should be granted in his favor or the case should be remanded for trial.

As to defendants Fineman and Field, on this record I find their conduct more culpable than Pechous'. In *Herbert v. Lando* (1979), 441 U.S. 153, 156-57, 60 L. Ed. 2d 115, 121-22, 99 S. Ct. 1635, 1639, the court stated that defamation plaintiffs must prove that the defendants "had published a damaging falsehood 'with "actual malice"—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.' This was the holding of *New York Times Co. v. Sullivan,* 376 U.S. 254, 280 [11 L. Ed. 2d 686, 84 S. Ct. 710] (1964), with respect to alleged libels of public officials, and extended to 'public figures' by *Curtis Publishing Co. v. Butts,* 388 U.S.

130 [18 L. Ed. 2d 1094, 87 S. Ct. 1975] (1967). Under this rule, absent knowing falsehood, liability requires proof of reckless disregard for truth, that is, that the defendant 'in fact entertained serious doubts as to the truth of his publication.' *St. Amant v. Thompson,* 390 U.S. 727, 731 [20 L. Ed. 2d 262, 267, 88 S. Ct. 1323, 1325] (1968). Such 'subjective awareness of probable falsity,' *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 335 n.6 [41 L. Ed. 2d 789, 802 n.6, 94 S. Ct. 2997, 3004 n.6] (1974), may be found if 'there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.' *St. Amant v. Thompson,* [390 U.S. 727, 732, 20 L. Ed. 2d 262, 267-68, 88 S. Ct. 1323, 1326 (1968)]." The court also noted that it had affirmed a jury verdict of liability for defamation in *Curtis Publishing Co. v. Butts* (1967), 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 by examining "direct as well as indirect evidence" for proof of actual malice. (*Herbert v. Lando* (1979), 441 U.S. 153, 160, 60 L. Ed. 2d 115, 124, 99 S. Ct. 1635, 1641.) Information on that record and considered probative included, *inter alia,* the Saturday Evening Post's motives in publishing the story at issue, its sources and its "conclusions as to the importance and veracity of sources and information presented in the article." See *Herbert v. Lando* (1979), 441 U.S. 153, 157-61 & nn. 2 & 6, 60 L. Ed. 2d 115, 122-24 & nn. 2 & 6, 99 S. Ct. 1635, 1639-41 & nn. 2 & 6.

Thus, the majority appropriately discussed the notes submitted by the reporter in the course of his investigation which state: "strongly feel $ has changed hands instinctive feeling." And the majority implies that the result reached here would be reversed "had it been shown, by way of depositions, answers to interrogatories, admissions, or affidavits, that Pechous had told Fineman that his charge of bribery was prompted by 'instinct' alone and that he had no evidence to support it." 83 Ill. 2d at 170.

The reporter, however, did answer interrogatories propounded by plaintiffs. Interrogatory No. 3(d) asked:

> "With reference to your talking with the said Robert C. Pechous regarding the awarding of said contract: State whether any tape recording, written memorandum or other record of such talk(s) was made by you. If so, produce a copy of each such recording, written memorandum or other record."

The reporter replied: "Yes—see notes attached." It is also significant that, in plaintiffs' petition for leave to appeal, the "instinctive feeling" quotation was cited and relied upon as a ground justifying the reversal of the appellate court's decision. The accuracy or the meaning of this quotation has never been challenged in this court by defendants Fineman and Field, despite numerous opportunities to do so. In oral argument, counsel for petitioners stated, while discussing whether defendants Fineman and Field had exercised caution in printing Pechous' quotation: "What more elementary precaution can there be than to have an individual who makes the charge himself admit to a reporter that he has no facts and say beyond that to the reporter as the record in this case demonstrates, that I have an instinctive feeling, I think money changed hands ***." Counsel for Pechous also quoted and relied upon the "instinctive feeling" quotation in argument. Counsel for defendants Fineman and Field never challenged the accuracy or meaning of the quotation. Even without this particular quotation, however, I think it is clear from Pechous' reported comments (see the appendix) that Pechous' "charge" was a suspicious inference and that he accurately communicated the state of his own knowledge to the reporter. If the facts Pechous had were insufficient to shield him from liability, those same considerations should operate against granting Fineman's and Field's motion for summary judgment.

The reporter had plenty of time to compose his story

and a perspective of several months which was unavailable to participants at the January meeting, like Pechous and members of the audience who, according to one of the aldermen, yelled "payoff" as the contract was voted upon. He had Pechous' information and had obtained the exculpatory explanations of the aldermen. He made an investigation and found no evidence cash payoffs had been made. He then transformed Pechous' statement into the hard factual charge of payoffs. Moreover, he could have written the article without quoting Pechous' "30 pieces of silver" statement. The gist of the controversy could have been repeated without it. In my view, therefore, the evidence does not justify holding Pechous liable while exonerating defendants Fineman and Field.

Thus far I have accepted, *arguendo,* the majority's determination that the actual-malice standard had to be applied. If this court purports to apply that standard, it should be correctly applied.

There is some merit, however, in applying a fair-comment privilege to Pechous' remarks and to the reporting of those remarks.

The fair-comment privilege has been recognized by the United States Supreme Court (see *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 292 n.30, 11 L. Ed. 2d 686, 713 n.30, 84 S. Ct. 710, 732 n.30), although the extent of the privilege has never been defined. In *Greenbelt Cooperative Publishing Association v. Bresler* (1970), 398 U.S. 6, 26 L. Ed. 2d 6, 90 S. Ct. 2537, however, the court decided that a newspaper's accurate report of tumultuous city council meetings in which several speakers characterized a prominent local builder's negotiating position as blackmail was not actionable defamation. The basis for the charge of blackmail was clearly set forth in the article; consequently it was unreasonable to conclude that the word "blackmail" constituted anything other than "a vigorous epithet used by those who considered [the

builder's] negotiating position extremely unreasonable."
(398 U.S. 6, 14, 26 L. Ed. 2d 6, 15, 90 S. Ct. 1537, 1542.)
And in *Gertz v. Robert Welch, Inc.* (1974), 418 U.S.
323, 41 L. Ed. 2d 789, 94 S. Ct. 2997, the court distin-
guished opinions and ideas, incapable of being proved
false and therefore nonactionable, from actionable false
statements of fact. The former, said the court, depend on
the competition of other ideas for their correction, while
the latter do not advance society's interest in robust
debate. 418 U.S. 323, 339-40, 41 L. Ed. 2d 789, 805,
94 S. Ct. 2997, 3007. See also *Old Dominion Branch No.
496 v. Austin* (1974), 418 U.S. 264, 41 L. Ed. 2d 745,
94 S. Ct. 2770.

Since the persons allegedly defamed here were public
officials and since the comments made concerned a matter
of public significance, we would not in this case have to
decide the extent of protection afforded to opinions
concerning private individuals or private matters. See
*Pfister v. Milwaukee Free Press Co.* (1909), 139 Wis. 627,
640, 121 N.W. 938, 944; Hill, *Defamation and Privacy
Under the First Amendment,* 76 Colum. L. Rev. 1205,
1229 n.113 (1976).

The majority here holds that Pechous' comments,
because they supposedly impute bribery, cannot be con-
sidered an opinion because it is not " 'rhetorical hyper-
bole' " and because it informed the audience that a crim-
inal act "of which the audience was unaware" had been
committed. (83 Ill. 2d at 162.) I do not think, however,
that the audience believed Pechous had more informa-
tion than it did. (*Cf.* Restatement of Torts (Second) sec.
566, comment *c* (1977).) Pechous' remarks were
suspicious inferences, stated and understood as such, and
based upon public information. The members of the public
who heard or read Pechous' remarks were fully able to
make up their own minds on the issue, and they could
conclude either that Pechous had defamed himself by

making an unwarranted inference or that his suspicion reflected and represented their own views. The majority has unwisely chosen to assume that the categories of fact and opinion are mutually exclusive (*cf.* Restatement of Torts sec. 566, comment *b* (1977)), ignoring the role of the tentative hypothesis and the inferential comment in public discourse. People do not communicate solely by asserting conclusions about which they are completely certain, and people are not understood in such a fashion. The majority opinion would logically encompass mere questions which indicate that the questioner is suspicious.

Inferential comments concerning political issues and public figures can have great value to the political process. An evaluation of known or available facts may spark the production of additional information through the investigatory actions of others and additional discussion by those seeking to implement a particular program. Pechous' comments in this case did spark such activity.

In this case, moreover, the defendants were public officials. Public officials generally have access to the media (*Troman v. Wood* (1976), 62 Ill. 2d 184, 193); hence not only is the factual predicate known, permitting the public to reach its own conclusions (about the speaker as well as the plaintiffs), but it is likely that the competing inferences will be heard. Here, the media reported in the same article the countercharges of the aldermen, to wit, that Pechous' statements were motivated by political ambition and partisanship, and their defense of the merits of the private-scavenger-service contract. This access to the marketplace of ideas distinguishes this situation from those in which an authoritative pronouncement that a particular statement was false (*Troman v. Wood* (1976), 62 Ill. 2d 184, 195) is desirable.

There may be instances in which the fair-comment privilege should be defeated: (1) if an expression implies that the speaker is aware of defamatory facts unknown to

his listeners or readers (compare Restatement (Second) of Torts sec. 566, comment *c*, illustration 4 (1977), with Restatement (Second) of Torts sec. 566, comment *c*, illustration 5 (1977)); and (2) if the source of the defamatory inference conceals, with actual malice, facts which would tend to negate the inference. (See *Curtis Publishing Co. v. Butts* (1967), 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975; *Cianci v. New Times Publishing Co.* (2d Cir. July 11, 1980), 49 U.S.L.W. 2070.) In both situations, the public is prevented from making up its own mind on the issues and the courts should intervene to assure a fair public debate.

The problem with restricting the fair-comment privilege to hyperbolic, loose or figurative statements is that the privilege will only protect those who defame in ambiguous language. (This same criticism is made of the innocent-construction rule.) All critics may not be so crafty. And certainly the difficulty of determining which comments have a meaning enabling their verification (compare the majority opinion in *Old Dominion Branch No. 496 v. Austin* (1974), 418 U.S. 264, 282-86, 41 L. Ed. 2d 745, 761-63, 94 S. Ct. 2770, 2780-82, with the dissent (418 U.S. 264, 296-97, 41 L. Ed. 2d 745, 768-69, 94 S. Ct. 2770, 2787 (Powell, J., dissenting))—the inquiry necessary to determine, under the majority's approach, whether a statement constitutes a fact rather than an opinion—may be more difficult than deciding the scope of the privilege under the approach I would take, especially in view of constant changes in word usage. See Yankwich, *Recent Developments in the Law of Creation, Expression, and Communication of Ideas,* 48 Nw. U.L. Rev. 543, 544-51 (1953), *contra,* Keeton, *Defamation and Freedom of the Press,* 54 Tex. L. Rev. 1221, 1233-59 (1976).

In sum, then, I am persuaded that the fair-comment privilege, a privilege with ancient roots in this State (see *Hahnemannian Life Insurance Co. v. Beebe* (1868), 48

Ill. 87), and which represents the trend of the constitutional common law of defamation, is applicable here. If I am wrong on this point, however, and if the actual-malice standard should be applied, then I am persuaded that the majority opinion has incorrectly applied the standard. Under this standard, defendant Pechous is either entitled to a trial or summary judgment. Defendants Fineman and Field are not entitled to summary judgment, under this standard, and their case should be remanded for trial.