(No. 41699.—

Myrtle S. Farnsworth, Appellant, *vs.* Tribune Company *et al.,* Appellees.

*Opinion filed November 26, 1969.*

ELMER GERTZ, of Chicago, (WAYNE B. GIAMPIETRO, of counsel,) for appellant.

KIRKLAND, ELLIS, HODSON, CHAFFETZ & MASTERS, of Chicago, (DON H. REUBEN, LAWRENCE GUNNELS, MICHAEL W. COFFIELD, and CALVIN J. COLLIER, of counsel,) for appellees.

Mr. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

The principal issue in this case concerns the scope of the restrictions imposed by the first and fourteenth amendments of the Federal constitution upon the power of a State to afford tort remedies for harm caused by spoken or written words.

Plaintiff, Myrtle S. Farnsworth, an osteopathic physician holding a limited license issued by the State of Illinois, brought a libel action against the Tribune Company, publisher of the Chicago Tribune, and against Norma Lee Browning, a feature writer and reporter for the newspaper, based upon the publication of three articles on December 3, 4 and 7, 1961, which allegedly libelled and defamed her in her professional capacity. She claims that the articles, which, among other things, labelled her as a "quack",

caused her practice to diminish and disappear, making it necessary for her to withdraw from the practice of her profession and that she was thereby damaged in the amount of $1,000,000. She also alleges that the allegations of the articles with respect to her were untrue and known by defendants to be false, alleges actual malice on the part of both defendants and seeks $1,000,000 exemplary and punitive damages.

Defendants admit the publication of the articles, but urge that plaintiff is not entitled to recover because the articles are a privileged and non-actionable exercise of the right to report and comment upon matters of public interest and concern, both at common law and under the free speech and press guarantees of the Federal constitution and section 4 of article I of the Illinois constitution. Additionally it is argued that the articles are a privileged and non-actionable exercise of the right to publish the truth both at common law and under the free speech and press guarantees of the constitutions.

The case was tried before a jury in April, 1968, and resulted in a not-guilty verdict upon which judgment was entered. A direct appeal was taken to this court on the ground that the trial court expressly refused to instruct the jury in accordance with the provisions of the Illinois constitution and defendants concede the presence of constitutional questions.

Plaintiff contends that the jury was improperly instructed as a result of the trial court's refusal to give an instruction based on section 4 of article II of the Illinois constitution that "Truth is a defense in a libel action only when published with good motives and for justifiable ends." Further, she contends the instructions which were given shifted the burden from defendants to prove that the articles were true and well motivated and forced the plaintiff to prove that the articles were false. The given instructions were based upon the trial court's understanding of the holdings in *New York*

*Times* v. *Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710, and its progeny.

Plaintiff argues that the court should have given her offered instruction, based upon the Illinois constitution, that truth is a defense in a libel action only when published with good motives and for justifiable ends.

Defendants reply that an instruction requiring them to prove the truth of the articles and that publication was for good motives and justifiable ends is constitutionally improper under the holdings of *New York Times* and later United States Supreme Court cases.

In *New York Times* the court held that "The constitutional guarantees [of freedom of speech and press] require * * * a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." (376 U.S. at 279-80, 11 L. Ed. 2d at 706, 84 S. Ct. at 726.) The case overturned the Alabama law that in actions involving libel *per se* malice was implied and need not be proven.

In *Garrison* v. *Louisiana* (1964), 379 U.S. 64, 13 L. Ed. 2d 125, 85 S. Ct. 209, the court held constitutionally invalid the Louisiana criminal libel statute insofar as it directed punishment for true statements regarding official conduct of public officials made with actual malice. The court stated: "Truth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned." 379 U.S. at 74, 13 L. Ed. 2d at 125, 85 S. Ct. at 216.

In *Curtis Publishing Co.* v. *Butts* (1967), 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975, the scope of the protection established in *New York Times* regarding defamation of public officials was extended to include "public figures" who are involved in issues in which the public has a justified and important interest.

It is therefore clear that the article II, section 4·provisions of the Illinois constitution that truth is a defense in a libel action only when published with good motives and for justifiable ends (*Ogren* v. *Rockford Star Printing Co.,* 288 Ill. 405), when applied to defamation of "public officials" or "public figures", is incompatible with the Supreme Court's interpretation of the scope of the first amendment guarantees of the Federal constitution. Accordingly, if the plaintiff is a "public figure" or if, as hereinafter discussed, the articles contain matters of public interest and concern so that the Federal constitutional safeguards apply, the trial court was correct in refusing to give the plaintiff's instruction based upon section 4 of article II.

Plaintiff argues that none of the aforementioned cases would extend the constitutional protection to the articles in the present case, and claims that she is not a "public official" as that term has been defined in *New York Times; Garrison; Rosenblatt* v. *Baer* (1966), 383 U.S. 75, 15 L. Ed. 2d 597, 86 S. Ct. 669, and *St. Amant* v. *Thompson* (1968), 390 U.S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1323. With this much we agree. She distinguishes herself from the "public figures", Butts and Walker, because, unlike these plaintiffs, she was not known to the public prior to the articles, she did not invite the articles, and she had no recourse against the allegations of the articles other than this suit. However, this does not mean that the rationale of those and other cases is not applicable here.

In our judgment the scope of the "public figure" classification must be determined by an examination of the underlying rationale of the first amendment protection involved. The cases have seemed to establish that "the question is whether a public issue, not a public official [or public figure], is involved." (*Rosenblatt* v. *Baer,* 383 U.S. 75, 91, 15 L. Ed. 2d 597, 609, 86 S. Ct. 669, 678 (concurring opinion).) In *Butts,* Justice Harlan expands the basic rationale. He states: "In *Time, Inc.* v. *Hill,* 385 U.S. 374, at 388,

we held that '[t]he guarantees for speech and press are not the preserve of political expression or comment upon public affairs * * *' and affirmed that freedom of discussion 'must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.' *Thornhill* v. *State of Alabama*, 310 U.S. 88, 102. This carries out the intent of the Founders who felt that a free press would advance 'truth, science, morality, and arts in general' as well as responsible government. Letter to the Inhabitants of Quebec, 1 Journals of the Continental Cong. 108." 388 U.S. at 147, 18 L. Ed. 2d at 1106, 87 S. Ct. at 1987.

It is evident from the earlier decision in *Hill* that the constitutional protection is not limited to utterances that might enhance the resolution of political or governmental questions. There the court held that "the subject of the Life article, the opening of a new play linked to an actual incident, is a matter of public interest." (385 U.S. at 388, 17 L. Ed. 2d at 467, 87 S. Ct. at 542.) There is no indication that public discussion of this subject would enhance the resolution of any serious social or governmental problems, or advance the arts. Rather, the key seemed to be that it was a matter of public interest and that fact was sufficient to trigger at least the constitutional protections of *Butts*.

In our judgment the conclusion is inescapable from *Times, Garrison, Butts* and the other cases previously cited that the defendants in this case must be accorded at least the same degree of immunity accorded the defendant in *Butts*. Medical quackery is an area of critical public concern which clearly qualifies under the *Butts* test as a subject " 'about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.' " (*Butts*, 388 U.S. at 147, 18 L. Ed. 2d at 1106, 87 S. Ct. at 1987.) It seems probable that the salutary effect of, and benefits from, commentary on quackery would be largely nullified if such comment were not to extend to

instances as here, where the object of comment is a particular practitioner. In determining a subject's importance to the public, we must consider not only the number of persons affected by the subject, but also the severity of its impact upon those so affected. Thus, the fact that plaintiff's personal contacts were presumably with only a small portion of the public does not militate against immunity where the publications concern a matter of such vital importance as the qualifications and practices of one who represents herself as qualified to treat human ills. *United Medical Laboratories, Inc.* v. *Columbia Broadcasting System, Inc.* (9th cir. 1968), 404 F.2d 706, *cert.* denied, 37 U.S.L.W. 3352; see *Doctors Convalescent Center, Inc.* v. *East Shore Newspapers, Inc.*, 104 Ill. App. 2d 271; *All Diet Foods Distributors, Inc.* v. *Time, Inc.* (Sup. Ct. 1967), 56 Misc. 2d 821, 290 N.Y.S.2d 445.) This conclusion is supported by pre-*New York Times* cases which established a qualified privilege for publications concerning public health and medical quackery. *Brinkley* v. *Fishbein* (5th cir. 1940), 110 F.2d 62 (applying Texas law); *Krebiozen Research Foundation* v. *Beacon Pres, Inc.*, 334 Mass. 86, 134 N.E.2d 1, *cert.* denied 352 U.S. 848.

We therefore conclude that the trial court correctly refused the plaintiff's instruction based upon the language contained in section 4 of article II of the Illinois constitution, for that provision is federally unconstitutional as we have heretofore noted, to the extent that it would require a defendant who had published statements about public affairs or of public interest and concern to prove that they were true, and published with good motives and for justifiable ends. It follows from this discussion that it was not error to give defendants' instructions.

Plaintiff points out that it is traditional tort law that libel *per se* implies falsity and therefore the burden was upon the defendants to prove the truth of the defamatory statements. (Prosser, Torts (3d ed.) § 111 at 825.) She notes that the

given instruction placed the burden of proving the falsity of the statements upon her. She claims that "nowhere in any of the Supreme Court opinions on this subject is such an obviously wrong ruling even hinted at."

That court has more than hinted at such a ruling, however, for in *Garrison* the court stated "We held in *New York Times* that a public official might be allowed the civil remedy *only if he establishes that the utterance was false* and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true." (Emphasis added.) (379 U.S. 64, 74, 13 L. Ed. 2d 125, 132, 85 S. Ct. 209, 215.) This is in accord with the State law which had developed similar privileges. See *Phoenix Newspaper, Inc.* v. *Choiser* (1957), 82 Ariz. 271, 312 P.2d 150, 154; *Bufalino* v. *Maxon Bros., Inc.* (1962), 368 Mich. 140, 117 N.W.2d 150, 158.

Plaintiff argues that it was error to give the defendants' fair comment and criticism instruction because that instruction stated that the comment need be based only upon the "substantial" truth. Plaintiff concedes that when the defense is truth, only substantial truth need be shown. (Prosser, Torts (3d ed.), § 111 at 825; see also, *Wilson* v. *United Press Ass'n,* 343 Ill. App. 238, 243.) However, she claims that when a defendant relies upon the qualified privilege of fair comment and criticism, it is not sufficient for him to show substantial truth.

The portion of the articles which plaintiff complains of in this respect is as follows: "Shortly after my first bout with Dr. Myrtle 12 years ago, she was arrested for practicing medicine without a license. She denied giving me pills and the case against her was dismissed for lack of evidence." Plaintiff proved that in fact she was found not guilty.

Although the law of defamation is currently undergoing profound change resulting from the priority placed upon first amendment guarantees, there is no indication of abandonment of the requirement of an accurate or fair ac-

count of the factual basis for privileged fair comment. (*Coursey* v. *Greater Niles Twp. Publishing Corp.*, 40 Ill.2d 257, 262.) The article dealt with medical quackery and while it may fairly be said to portray plaintiff as a "quack", the inaccuracy of the statement relating to dismissal of the case does not alter the substantial truth of the article as a whole. We therefore hold that it was not error to give the instruction complained of.

Of the many evidentiary errors complained of, only one merits extended comment. The questioned articles included reference to an examination of Miss Browning by the plaintiff some 12 years earlier. They also indicated plaintiff had "tuned into" Miss Browning with a 'hocus gadget known as the Drown machine and * * * came up with a diagnosis of 14 major ailments * * *." Theresa Phelps was offered by plaintiff as a witness, but her testimony was excluded, apparently on the mistaken premise that an action based on a report of an occurrence 12 years earlier was barred by the statute of limitations. While this ruling was clearly erroneous since the complaint incorporated the recently published articles which were the basis for the action, we do not regard it as reversible error.

Mrs. Phelps testified she served as plaintiff's receptionist in 1949 at the time Miss Browning was at the office. The offer of proof indicates the discussion between plaintiff and defendant Browning related only to "fevers" and that plaintiff made no statement as to a large number of illnesses, but gave Miss Browning a slip to get a blood count. The witness did not see plaintiff examine defendant on the Drown machine.

The plaintiff's testimony relative to the 1949 visit was that defendant Browning asked her what could cause a fever and "I explained to her that we would take the various fevers and rule them out one by one," and that plaintiff did so. Plaintiff stated that Miss Browning was "put on" the Drown machine, but "only * * * long enough to take a differ-

ential blood count on the instrument and check on any—the urine and the blood pressure, just those tests. Then she was sent to a laboratory to have tests made and was told to return for any diagnosis, but she never did return." Plaintiff testified that she never used the machine to treat Miss Browning or to give her a diagnosis. "I never completed any diagnosis whatsoever or stated any diagnosis to her in any way."

In view of the entire record we believe that exclusion of the testimony of Mrs. Phelps was not prejudicial to plaintiff. Her proffered testimony was much narrower than, and was to some extent in conflict with, the testimony given by the plaintiff: *e.g.,* Phelps said nothing of the discussion of the numerous diseases; the plaintiff testified the diseases were expressly discussed but not given as diagnosis; Phelps said she did not see plaintiff examine Miss Browning on the Drown machine, and plaintiff admitted to having used it on Miss Browning. Furthermore, the evidence was relevant only to show actual malice—a knowing disregard for the truth—on the part of defendants. The events of 1949 constituted only a small portion of the articles whether measured in terms of newspaper space or strength of allegation.

Other allegations in the articles which were clearly born out by the evidence in the record, included the fact that at that time the sign on plaintiff's office door read:

"M. S. Farnsworth, D.O.
Harry S. Solomon, M.D.
Mme. J. Lopez, Dis. of Be-Slim."

Madame Lopez had been a friend of plaintiff and officed with her for some years both prior to and at the time defendants' articles were published. The Madame had advertised herself as a "mystic Psychologist", and "spiritual adviser", and a "musical tea leaf reader" who could give blessings and messages. At the same time she was listed on plaintiff's door she was also operating a "religious gift shop" on a lower floor in the same building, there holding

herself out as a "Christian Psychologist and Family Counsellor." Additionally the undenied testimony of defendant Browning established that on a visit to the gift shop in 1961 Miss Browning was told by Madame Lopez (after an examination of defendant's handwriting) that Miss Browning had bacteria in the kidneys, back trouble, thyroid trouble, weak eyes, dead hair and pork worms. Following a telephone conversation between Madame Lopez and an unidentified person, defendant Browning testified that Dr. Farnsworth appeared at the madame's gift shop and gave Miss Browning a bag containing a bottle of "Farnoplex" pills for which $7.50 was paid by Miss Browning. Madame Lopez did not testify, and, while plaintiff denied ever delivering Farnoplex to defendant Browning, plaintiff's testimony as to her relationship with Madame Lopez was so thoroughly impeached that the jury might well have disregarded the denial. Previously plaintiff had been associated with and shared offices in Chicago with Dr. Russell A. Winters who in 1947 was suspended for a period of four years from membership in the Chicago Medical Society for professional misconduct. Plaintiff also shared offices with a Dr. Findley John and testified that the two were working together and referring patients to each other. In 1950, Dr. John was expelled from the Chicago Medical Society for professional misconduct. Plaintiff testified that she had ceased her association with each of these individuals two or three years prior to the time of the proceedings against them.

The Be-Slim products referred to on the office door sign were manufactured by a firm of which Merle G. Farnsworth, plaintiff's husband, was president. In 1958, the FDA seized a shipment of Be-Slim and cited the firm. After the citation, the firm apparently ceased doing business. The Drown machine, above referred to, was a mechanical device which the inventor of the machine represented to have fantastic diagnostic and treatment capabilities. The inventor, Ruth Drown, was prosecuted by the Food and Drug Administra-

tion and convicted of selling the machine in violation of the Food, Drug and Cosmetics Act. Plaintiff claimed to have discontinued the use of the machine after the publication of certain articles concerning her use of it appeared in the *Tribune* following Miss Browning's 1949 visit to the plaintiff's office. However, Dr. William Mauer, a long-time family acquaintance of plaintiff, testified that in June of 1962 plaintiff appeared before the Board of Trustees of the Illinois Osteopathic Association and said she was at that time using the Drown machine on patients that asked for it or that she had used it upon previously. The minutes of that meeting introduced into evidence corroborated Dr. Mauer's testimony. According to Dr. Mauer and the board's minutes, plaintiff stated to the board that she would be willing to discontinue the use of the machine if the board so directed. Those minutes also indicate plaintiff explained to the board that Madame Lopez was a retired FBI employee who had, upon retirement, received credit because of her loyalty for 25 years service. The FBI records contained no indication that the madam had ever been in its employ. At that meeting the board adopted a resolution suspending plaintiff from membership in the association unless she disposed of the Drown machine.

Plaintiff's testimony, when considered as a whole, may fairly be categorized as evasive and unconvincing, and, while we have examined the other errors complained of, we conclude that the end result would not be affected by a discussion of them. None of the evidence which plaintiff contends was improperly excluded would have established that subjective frame of mind of the defendants which is necessary to support a finding of "actual malice." *Tunnell* v. *The Edwardsville Intelligencer, Inc., ante,* at p. 239.

The judgment of the circuit court of Cook County is accordingly affirmed.

*Judgment affirmed.*