**John G. SPELSON, D.C., Plaintiff,**

v.

**CBS, INC., a California corporation, Defendant.**

No. 82 C 3780.

United States District Court, N.D. Illinois, E.D.

March 8, 1984.

---

Joseph V. Moschetti, Lisle, Ill., for plaintiff.

Thomas H. Morsch, Arlene C. Erlebacher, Stephen C. Carlson, Ted K. Yasuda, Sidley & Austin, Chicago, Ill., for defendant.

## MEMORANDUM ORDER

BUA, District Judge.

The instant case was brought by plaintiff John Spelson, a licensed chiropractor, against defendant CBS for defamation of plaintiff's character in connection with broadcasts produced and aired by WBBM–TV Channel 2, a CBS-owned television station in Chicago, Illinois. The series of broadcasts, titled "Cashing in on Cancer," aired from April 25, 1982 through May 5, 1982, and were accompanied by an editorial which was broadcast on April 30, 1982, May 1, 1982, and May 3, 1982. In the series, WBBM–TV reporter Pam Zekman and the Channel 2 investigative team sought to uncover the questionable practices of various individuals who were engaged in "cancer quackery." Plaintiff Spelson was one of the individuals whose conduct was investigated.

Jurisdiction over the instant case is based on diversity, 28 U.S.C. § 1332, as plaintiff is an Illinois resident and defendant, by virtue of being incorporated in California, is a resident of California. The amount in controversy exceeds $10,000. Venue is proper in this district under 28 U.S.C. § 1391(a).

Before the Court is the defendant's Motion for Summary Judgment.[1] The Court has viewed the videotapes of the broadcasts and has examined all other materials submitted. For the reasons stated herein, Summary Judgment is granted for defendant.

## FACTS

Plaintiff is a licensed chiropractor with a practice in Oak Park, Illinois. He claims, in Count I, that various statements contained in the aforementioned broadcasts related to him and were defamatory. In Count II, plaintiff claims that an editorial which was broadcast at various times on WBBM–TV Channel 2 falsely accused him of criminal behavior and otherwise defamed him.

The statements complained of are set out as follows:[2] The "defamacast," as plaintiff artfully describes the broadcasts, began on April 25, 1982, with an introductory statement by the anchorman that the investiga-

---

1. The motion initially filed was styled a Motion to Dismiss Plaintiff's Third Amended Complaint. Because the motion and the subsequent responsive memoranda were accompanied by affidavits and exhibits including transcripts, on May 11, 1983, the Court notified the parties that it would treat the Motion to Dismiss as a Motion for Summary Judgment as allowed by Fed.R. Civ.P. 12(b). The parties were then given 30 days to submit additional material in support of or in opposition to the motion. No additional materials were submitted at that time. How-

ever, on November 1, 1983, pursuant to this Court's order, videotapes of the broadcasts were submitted to the Court.

2. The specific statements complained of are set out by quotation marks throughout this opinion. All other statements of the defendant's reporters are not set out in quotes as such statements are not complained of by the plaintiff. The Court has taken some liberty in paraphrasing the broadcast as to those statements not sued upon.

tors have crossed the country, documenting "an international network of medical quackery." After the introduction was complete, reporter Pam Zekman appeared on the set and began, "Cancer quackery is the cruelest form of medical fraud..." She continued by stating that the investigative team interviewed medical experts and the victims of "cancer con-artists" and admitted to having been guinea pigs for some "practitioners of fraud." According to Zekman, the investigation revealed an industry which is "thriving on exploitation."

Later in the broadcast, Zekman reported that one of her investigators went to an unlicensed nutritionist. Following an examination, the investigator was told to take 134 pills per day. These pills contained vitamins, minerals, and extracts of raw animal organs and cost $365 for a 21-day supply. Zekman asked Dr. Robert Young of the Food and Drug Administration what he thought of the foregoing scenario. Young responded that it was essentially "consumer fraud."

The pills which the investigator bought are promoted by Dr. Harold Manner, an individual who travels the country pushing the products for his "discredited cancer therapy," Manner Metabolic Therapy,[3] which, according to Dr. Victor Herbert of the State University of New York, is the "purest form of quackery."

Zekman continued by explaining that medical standards have been ignored, for example, in the use of machines, one of which the FDA has declared grossly fraudulent. A federal judge once declared the machine a quack device because it couldn't tell a dead patient from a live one. Zekman reported that the machine is one of many worthless devices used by a west suburban chiropractor, presumably Spelson. A picture of Spelson was then flashed on the screen.

Zekman followed by asking a cancer patient if she thought she were the "victim of a fraud." The response was in the affirmative.

In the following broadcast, aired April 26, 1982, the anchorman introduced the segment by saying, "Untrained, unqualified and unscrupulous health practitioners" are exploiting desperate patients. Zekman then came on the air and led off the day's report by informing the audience that health practitioners had been found in Illinois who were using "illegal drugs" to treat cancer. One of these practitioners was the plaintiff, John Spelson, who was specifically referred to and pictured on the screen.

After explaining that Spelson treated patients through Metabolic Therapy, a treatment which utilizes megadoses of vitamins, purportedly to build up the immune system and break up tumors, Zekman reported that a cancer patient, whom Spelson told had a 50-percent chance of living, had had a blood test performed upon her for which Spelson required payment of $3,000 in advance. Zekman further reported that the patient had borrowed money to pay for the tests, assuming that her insurance company would cover it, but that the insurance company balked, claiming that its consultant on chiropractors said that "Spelson had overstepped the bounds of his training." In the opinion of another chiropractor, Dr. Charles DuVall, "such treatment as that is unethical, unprofessional, inhuman, and totally worthless." Zekman went on to ask a cancer patient, "Do you think he's exploiting cancer patients?" Laughing, the patient answered, "Do I think it; I know it."

Later in the broadcast, Zekman said, "We've shown you how Spelson and Pfeiffer exploit the dying. We've also found they exploit those who have a chance to live." She went on to explain that individuals with curable forms of cancer were lured away from proven methods of treatment into Metabolic Therapy. Members of the Channel 2 investigative team posed as such patients. One was given 21-day therapy by a Dr. Pfeiffer, a chiropractor, which cost $2,500 and included blood and hair analysis

---

3. As of this writing, a federal grand jury is investigating Harold Manner and the Metabolic

Research Foundation concerning the alleged fraudulent sale of products such as laetrile.

and the prescription of 17 different kinds of pills, made up primarily of various processed animal organs. Zekman also reported that Pfeiffer sold the investigators laetrile in violation of state laws.

"State officials say chiropractors are not allowed to treat cancer with drugs," Zekman explained, "so Spelson and Pfeiffer say they are treating the body." According to Dr. Charles Moertrel of the Mayo Clinic, such behavior "really borders on the criminal." Zekman then reported that Spelson failed to respond to their repeated requests for an interview.

In the following report, aired on April 27, 1982, the anchorperson led off the report by saying that, "Phony medical machines" are being used by several Chicago area health practitioners to "defraud cancer patients." Zekman followed by naming three of the machines and by commenting that while the names sound impressive, they are really "tools of the quackery trade." She went on to report that Dr. Caecillia Winkler, who was shown on the screen, had used one of the machines, a Dermatron, to predict that one patient was going to get leukemia. After questioning one physician who disapproved of Winkler's actions, Zekman related the tests Winkler performed upon her and that she was charged $396 for 66 potions containing diluted toxins, germs, and other substances Winkler claimed would build up resistance to disease. Winkler once told the FDA that the powers of these serums was found in unknown energy.

After finishing the portion of the report on Winkler, Zekman stated, "John Manios and John Spelson ...," whose pictures appeared on the screen, "have an office full of worthless equipment." She then went on to explain that the FDA had tested the various machines and had determined that one, the Dynameter, which its manufacturer claimed could diagnose cancer and 54 other conditions, merely measured moisture in the skin, and that another, which purported to listen to the heart, was determined to be so inaccurate that its use constitutes a danger to the patient. She noted that a Dynameter can be found on display at the National Museum of Medical Quackery in St. Louis.

The following night's report, broadcast on April 29, 1982, began with a statement by the anchorperson that while an ounce of prevention is normally worth a pound of cure, to "cancer con-artists" it's worth a lot more than that. These individuals are cashing in on "phony cancer prevention programs." No other statements are complained of from that date's broadcast. However, on May 2, 1982, Zekman, in discussing doctors who practice under the banner of Metabolic Therapy, mentioned and pictured "John Spelson and John Manios, chiropractors who use worthless medical machines."

An editorial concerning the series was aired on April 30, 1982, May 1, 1982, and May 3, 1982. In the editorial, Tim O'Donnell, WBBM–TV's editorial director, related that Channel 2's investigative team had uncovered dramatic abuses and had shown "unscrupulous charlatans victimizing cancer patients" with expensive treatments and "phony cures." They've even "fleeced healthy people—exploiting their fear" of a disease they don't have, said the editorial.

O'Donnell related that the Attorney General's Office and the Department of Registration and Education are investigating the "con-artists," but that it was a difficult task because these "cancer quacks" were adept at avoiding prosecution for their "fraudulent practices."

Later in the broadcast, when discussing the numerous individuals who had been investigated, O'Donnell pointed out and pictured plaintiff Spelson. The editorial concluded by saying, "If you ... have been taken by these people," the Attorney General's Office would like to know. A phone number was provided for victims to call.

## ANALYSIS

Plaintiff's complaint is a potpourri of charges, allegations, and vague contentions regarding how plaintiff was injured and exactly which statements caused such inju-

ry. Specificity is grossly lacking as is a clear legal theory upon which the complaint is based. Nevertheless, the Court is bound to construe the pleadings liberally and in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

Insofar as the Court can discern, plaintiff contends that he was defamed by these broadcasts in that by innuendo, implication, and association, the broadcasts as a whole and the specific statements made therein damaged his reputation and moral character. Plaintiff alleges that these statements were made with malice and intent to do harm and that the statements were false. Plaintiff also complains of defendant's use of "fraudulent" medical reports to gain entry into his office and of defendant's intentional distortion of truth predicated upon Zekman's prejudice against any doctor who is not a medical doctor. Finally, plaintiff alleges that defendant did not provide a fair representation of all areas of cancer treatment and, consistent therewith, failed to provide certain information such as the medical profession's cost-to-cure ratio; that the report, while claiming to be national and international, only reported on selected Chicago area physicians; and that one of the patients treated was given up for dead by traditional medical practitioners, flourished for months under Metabolic Therapy, and gave up treatment only after an automobile accident.

Because this case is before this Court under diversity jurisdiction, the law of Illinois applies and is primarily that argued by the parties. *Fleck Bros. Co. v. Sullivan,* 385 F.2d 223 (7th Cir.1967); *Cantrell v. American Broadcasting Companies, Inc.,* 529 F.Supp. 746, 751–752 (N.D.Ill.1981). Nevertheless, Federal Rule of Civil Procedure 9(g) applies insofar as the required specificity of the allegations is concerned. *Brown and Williamson Tobacco Corp. v. Jacobson,* 713 F.2d 262 (7th Cir.1983).

**4.** As has previously been noted, the motion to dismiss will be treated as a motion for summary

Defendant has moved to dismiss the complaint on numerous grounds.[4] The grounds upon which it relies are (1) that many of the statements complained of are not "of and concerning" plaintiffs; (2) that the statements which do refer to Spelson are statements of opinion which are not actionable as a matter of law; (3) that even if the statements complained of are statements of fact, they are reasonably susceptible of an innocent construction; (4) that even if construed as misrepresentations of fact, the statements complained of are not defamatory *per se,* and the allegations are insufficient to state a claim for libel *per quod* as special damages are not sufficiently alleged, and; (5) that the complaint is insufficient in that "actual malice" is not sufficiently alleged notwithstanding that it is required to be because the statements concern a matter of public interest.

■ In Illinois the law of libel is controlled by the rule of innocent construction which requires that, where reasonable, statements must be innocently construed. According to the Illinois Supreme Court,

[A] written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if as so construed the statement may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff, it cannot be actionable *per se.*

.　　.　　.　　.

[T]he innocent-construction rule requires language to be ... treated [as opinion] only where that characterization, too, is a reasonable one.

*Chapski v. Copley Press,* 92 Ill.2d 344, 352, 65 Ill.Dec. 884, 442 N.E.2d 195 (1982). *See also, Catalano v. Pechous,* 83 Ill.2d 146, 50 Ill.Dec. 242, 419 N.E.2d 350 (1980).

■ Thus, not only does the rule of innocent construction apply to the meaning of the words, but to the identification of the

judgment.

object of the speech, or the question of colloquium, and to the determination of whether the statement is a statement of fact. According to the Illinois Supreme Court, the question of whether a statement may reasonably be innocently construed is initially a question of law; only if it is not capable of being innocently construed may the question be given to the finder of fact for a determination of whether it actually was so understood. *Chapski, supra.*

The language of the Supreme Court indicates that the issue of whether a statement is reasonably capable of being innocently construed shall only be analyzed in cases where the plaintiff is alleging libel *per se.*[5] Libel *per se* has been defined as words which are "so obviously and naturally hurtful to the person aggrieved that proof of their injurious character can be, and is, dispensed with." *Reed v. Albanese,* 78 Ill.App.2d 53, 58, 223 N.E.2d 419 (1st Dist.1966), *quoted in American Pet Motels, Inc. v. Chicago Veterinary Medical Association,* 106 Ill.App.3d 626, 62 Ill.Dec. 325, 435 N.E.2d 1297 (1st Dist.1982). There are four categories of speech which define libel *per se.* These categories involve words which impute (1) commission of a criminal offense; (2) infection with a communicable disease; (3) unfitness or want of integrity in the performance of the duties of an office or employment; or (4) the lack of the individual's ability to perform in his or her business, trade, or profession. *Fried v. Jacobson,* 107 Ill.App.3d 780, 63 Ill.Dec. 564, 438 N.E.2d 495 (1st Dist.1982); *American Pet Motels, Inc. v. Chicago Veterinary Medical Association, supra.* Statements falling outside of these categories may only be actionable as libel *per quod* which requires that the statement be actually defamatory and that special damages be alleged. *Id.*

The pleading of special damages in an action for libel *per quod* which, like the case at bar, is in federal court under diversity jurisdiction, is controlled by Fed.R.

Civ.P. 9(g) which states that "items of special damages ... shall be specifically stated." *Id.; Brown and Williamson Tobacco Corp. v. Jacobson,* 713 F.2d 262 (7th Cir. 1983). While there is no hard and fast formula for determining whether an item of special damages has been stated with sufficient specificity, it is clear that in this Circuit, the pleader must do more than allege that the injury suffered was the natural result of the alleged libel. At very least, the allegation of special damage must be "explicit." *Id.* at 270. Thus in *Brown and Williamson,* the Seventh Circuit held insufficient plaintiff's allegation that it had suffered and would continue to suffer as a result of the natural tendency of defendant's statements to undermine plaintiff's general reputation for honesty and decrease its sales and good will. The court distinguished its holding in *Continental Nut Co. v. Robert Berner Co.,* 345 F.2d 395 (7th Cir.1965), in which it held that plaintiff's claim of special damages was pleaded with sufficient specificity where the plaintiff had listed specific figures of its gross sales both before and after the publication of the statements along with its averments that the decrease in sales was the natural and proximate result of the statement. Similarly, the court in *Brown and Williamson* noted with approval *Barton v. Barnett,* 226 F.Supp. 375 (N.D.Miss. 1964), in which the court held that despite lengthy allegations of damage, the plaintiff's failure to allege the specifics of *how* his reputation and his professional and business career had been damaged by defendant's statement was fatal to his claim of libel *per quod.*

While the specificity requirement of Rule 9(g) may be out of sync with the liberal notice-pleading requirements prevalent in the Federal Rules of Civil Procedure, it is not without purpose. Indeed, underlying the strict pleading rule in libel *per quod* cases is the need of the courts to be able to dismiss groundless defamation cases at an

---

**5.** For a detailed analysis of the potentially ambiguous boundaries of libel *per se* in the context of the Supreme Court's opinion, see Smolla and Malone, *The Future of Defamation in Illinois After Colson v. Stieg and Chapski v. Copley Press, Inc.,* 32 DePaul L.Rev. 219, 289–290 (1983).

early stage of the litigation. *Brown and Williamson, supra,* citing *Barton, supra,* and *Grzelak v. Calumet Publishing Co.,* 543 F.2d 579 (7th Cir.1975). Certainly, this limitation is consistent with the spirit of the First Amendment. However, the First Amendment plays an even more important role in protecting statements of opinion from being sued upon.

▇ Obviously, if a statement is interpreted as innocent and not defamatory or as not relating to a particular plaintiff, that plaintiff cannot claim that he was presumptively injured by a specific statement without proof of special damages. Likewise, a statement which is held to be a statement of opinion and not a statement of objective fact is also not actionable. However, unlike statements, the meanings of which may be innocently construed or which may be interpreted as relating to someone other than plaintiff, statements of opinion are *never* actionable, even if special damages are alleged. Thus, while the Illinois Supreme Court limited the reasonable innocent construction rule to statements involving interpretation of meaning and colloquium to cases involving libel *per se,* it did not impose the same limitation on statements which may reasonably be innocently construed as opinion.

It has long been recognized that expressions of opinion are protected by the First Amendment and thus are not actionable. As the Supreme Court stated in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974),

> Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas.

*Id.* at 339–40, 94 S.Ct. at 3007.

> As an Illinois Appellate Court noted, While false statements of fact receive no constitutional protection, the expression of an opinion can never be false so as to constitute a statement of fact.

*Naked City, Inc. v. Chicago Sun-Times,* 77 Ill.App.3d 188, 190–91, 32 Ill.Dec. 661, 395 N.E.2d 1042 (1st Dist.1979).

▇ Along with being constitutionally protected, statements of opinion in the form of commentary are protected by the Illinois common law privilege of fair comment and criticism. Under this doctrine, statements are not actionable if (1) the publication is of an opinion; (2) it relates not to an individual but to his acts; (3) it is fair in the sense that the reader can see a factual basis for comment and draw his own conclusions; and (4) it relates to a matter of public interest. *Farnsworth v. Tribune Co.,* 43 Ill.2d 286, 253 N.E.2d 408 (1969) (suit over statement regarding medical quackery was protected by the privilege); *Catalano v. Pechous,* 69 Ill.App.3d 797, 25 Ill.Dec. 838, 387 N.E.2d 714 (1st Dist.1978), *aff'd.* 83 Ill.2d 146, 50 Ill.Dec. 242, 419 N.E.2d 350.

It is within the above framework that the Court will analyze the broadcasts in question. The Court will analyze the broadcast as a whole and will consider the statements in the context thereof. *See Cantrell v. American Broadcasting Companies, Inc.,* 529 F.Supp. 746, 752 (N.D.Ill.1981); *Bravo Realty, Inc. v. C.B.S., Inc.,* 84 Ill.App.3d 862, 865, 40 Ill.Dec. 360, 406 N.E.2d 61 (1980).

In the view of this Court, much of the broadcast material is incapable of a defamatory construction simply because the underlying subject matter, medical science, is at best an inexact science in which numerous and widely varied approaches and philosophies exist. Indeed, in his complaint, Spelson himself states that among defendant's alleged indiscretions was its prejudice against doctors who are not medical doctors and its failure to fairly represent all areas of cancer treatment. By so stating, even Spelson necessarily admits that the topic is one upon which there can be much debate and disagreement. That but one view among many is presented does not give rise to a cause of action for libel. To hold otherwise would be to place the unconstitutional power of censorship in the hands

of the courts. *See Reliance Insurance v. Barrons*, 442 F.Supp. 1341, 1352 (S.D.N.Y. 1977).

■ Viewed in its entirety, the so-called "defamacast," in the view of this Court, amounts to no more than an expression of opinion and commentary gleaned from intensive investigation and stated facts. The broadcasts clearly present the facts from which the opinions are derived and in so doing, allow for the possibility that an individual viewer could reach a different conclusion regarding the value of the practices which constitute the subject of the investigation. The broadcasts are only critical of Dr. Spelson's acts; at no point does CBS or its reporters criticize Spelson personally or even as a practitioner within the traditional bounds of the science of chiropractic. Plainly, the report concerns a matter of public interest. Therefore, the broadcasts are merely statements of opinion protected both by the First Amendment and by the Illinois common law right of fair comment and criticism.[6]

The Court begins analysis of the specific statements complained of with the premise that, in the opinion of CBS, the treatments offered by Dr. Spelson which were reported on in the report in question, are contrary to the beliefs of health science practitioners in the mainstream of medical and chiropractic thought and that such practices are therefore worthless or even dangerous. Regardless of the merit of this opinion, it is a view which CBS is entitled to hold and to expound. Given this opinion, the statement that defendant had documented an "international network of medical quackery" and that the individuals are "cancer con-artists" and "practitioners of fraud," can be interpreted as no more than a rational conclusion gleaned from defendant's opinion. Similarly, the statement that the industry is "thriving on exploitation" merely reflects defendants opinion that the industries' practices are without merit.

The statement that "cancer quackery is the cruelest form of medical fraud" can hardly be argued with. Indeed, Spelson does not challenge the truth of this statement.

The statement made later in the initial broadcast that certain practices of an unnamed nutritionist were "consumer fraud," aside from being a statement of opinion, can in no way be held to relate to Spelson who clearly is not a nutritionist but a chiropractor not referred to in that portion of the report. Obviously, this statement is not actionable. Similarly, the statement of defendant that Dr. Harold Manner travels the country pushing his "discredited cancer therapy," aside from also being a clear statement of opinion, cannot reasonably be construed as relating to Spelson and cannot be sued upon by him. The statement which follows which terms Manner's therapy the "purest form of quackery" is also a statement of opinion which does not relate to Spelson.

The next portion of the broadcast complained of concerns defendant's report that a west suburban chiropractor, Spelson, used various worthless machines in his treatments, one of which had been found to be grossly fraudulent by the FDA and a "quack device" by a federal judge. This portion of the report, aside from being a statement of defendant's conviction as to the worth of the machines, merely reports the fact that CBS' opinions have been substantiated by a regulatory body and a court of law. *See United States v. Ellis Research*, 300 F.2d 550 (7th Cir.1961) (affirming the opinions of Judge William J. Campbell of this Court).

■ Zekman's question of a cancer patient asking whether she thought she was a "victim of fraud" and the affirmative response which followed not only is an expression of opinion but may also be construed innocently.[7] While plaintiff correct-

---

**6.** Interestingly, despite being given the opportunity to do so, plaintiff Spelson declined defendant's request that he respond to the reports here complained of.

**7.** That the ultimate answer to defendant's question was given by an individual other than defendant would not shield defendant from liability if the statement were otherwise actionable as

ly argues that the fact that a statement is posed as a question does not exonerate the statement's maker from liability, *Cantrell v. American Broadcasting Companies, Inc.*, 529 F.Supp. 746, 756 (N.D.Ill.1981), in the instant case the question itself was capable of an innocent construction as the cancer patient who believed that she had been a victim of fraud could just as easily have stated that she had not. Unlike in *Cantrell*, the question posed in the case at bar did not necessarily amount to a direct accusation.

The following day's broadcast was prefaced by the comment of the anchorman that "untrained, unqualified, and unscrupulous health practitioners" are exploiting desperate patients. Aside from being a fair comment based on defendant's opinions on the subject, which is clearly a matter of public concern, the comment relates to no one in particular and is merely a prefatory comment containing no objective facts.

That CBS stated it had found practitioners in Illinois who used "illegal drugs" to treat cancer also is not actionable by Spelson. This statement is derived from a portion of the report concerning a Dr. Pfeiffer and does not in any way relate to Spelson.

Following CBS' explanation of how Spelson treated one particular patient with megadoses of vitamins (not illegal drugs and thus not the "illegal drugs" discussed *infra*.) and charged $3,000 for the services, a fact which Spelson does not deny, CBS reported that the patient's insurance company had refused to pay the bills because "Spelson had overstepped the bounds of his training." While the making of the statement by the insurance company is a fact which Spelson does not deny, the substance thereof is a statement of opinion of clear public interest based on stated facts relating not to Spelson as an individual but in his practices. Clearly the statement may properly be reported under the right of fair comment and criticism as may the statements of another chiropractor that Spel-

son's practices were "unethical, unprofessional, inhuman and totally worthless." Similarly, the question asked of a cancer patient concerning whether the patient thought Spelson was exploiting cancer patients and the subsequent response, "Do I think it; I know it," are privileged and protected expressions of opinions based on stated facts.

Later in the broadcast, the statement was made that, "We've shown you how Spelson and Pfeiffer exploit the dying. We've also found they exploit those who have a chance to live." The first statement is a statement of beliefs derived from the prior opinion, discussed above, that Spelson had exploited a particular patient. The second statement prefaced a report on the practices of Pfeiffer and did not in any way relate to Spelson. It therefore cannot be sued upon by him.

Reporter Zekman explained, "State officials say chiropractors are not allowed to treat cancer patients with drugs. So Spelson and Pfeiffer say they are treating the body." The first sentence is merely a statement of the law, the accuracy of which is not challenged. The second sentence is also not actionable *per se* as it appears that as a matter of law it is an innocuous statement capable of an innocent construction. For reasons more fully developed below, it is also clear that the statement cannot form the basis for a libel *per quod* action as no special damages arising from the particular statement are specifically alleged. The statement by Dr. Moertrel of the Mayo Clinic that such behavior "really borders on criminal" is merely a nonactionable statement of opinion which does not impute an actual heinous crime. Moertrel's opinion can reasonably be interpreted to accuse Spelson of "bad" acts and not specific "criminal" activity.

Like various statements discussed above, the prefatory remarks made on April 27, 1982 that, "Phony medical machines" are being used to "defraud cancer patients" amounts to fair comment based on clearly

---

an individual can be held liable for republication of the libelous statement as if the statement

were his own. *Catalano v. Pechous,* 83 Ill.2d 146, 50 Ill.Dec. 242, 419 N.E.2d 350 (1980).

evident facts. Similarly, the comment that some practitioners use "tools of the quackery trade" is based upon defendant's opinions. Those opinions also formed the basis for the statement that "John Spelson ... [has] an office full of worthless equipment," an opinion substantiated by the FDA. Finally, the following night's statements regarding "cancer con-artists" and "phony cancer-prevention programs" are also based on opinions as is the statement regarding "John Spelson and John Manios, chiropractors who use worthless medical machines."

The editorial, which Spelson also complains of, related that Channel 2 had shown "unscrupulous charlatans victimizing cancer patients" with expensive treatments and "phony cures" who have "fleeced healthy people—exploiting their fear" of a disease they don't have. This statement, like many others in the case, is merely a fair commentary based on stated facts which is protected by the First Amendment.

The statement in the editorial that various state agencies were investigating the "con-artists," a task made difficult because the "cancer quacks" were adept at avoiding prosecution for their "fraudulent practices" is also not actionable. The terms in quotes are fair comments based on stated facts which are protected. Further, the statement may be construed as merely reporting the investigation of wrong doing and not an accusation of crimes which would be actionable *per se.* The subsequent identification of Spelson as one of the practitioners investigated is not actionable as it merely identified him as the individual of whom defendant held an opinion. Finally, the editorial's statement inviting reports of wrong doing may be construed as not an accusation of a crime but an invitation to aid authorities in the investigation of possible wrongful behavior as well as a component of a fair report that an investigation is under way which requires aid from the public.

Even if the statements contained herein which the Court has interpreted as opinion and fair comment were construed as statements of fact, they would nevertheless not be actionable as they are not libelous *per se* and plaintiff has failed to state a claim for libel *per quod.*

To state a claim for libel *per se,* the statements complained of must involve words which impute (1) the commission of a criminal offense, (2) infection with a communicable disease, (3) unfitness or want of integrity in the performance of the duties of an office or employment, or (4) the lack of ability to perform in his or her business, trade, or profession. *Fried v. Jacobson,* 107 Ill.App.3d 780, 63 Ill.Dec. 564, 438 N.E.2d 495 (1st Dist.1982).

Nowhere in the broadcast is plaintiff accused of any specific crime. Indeed, one statement complained of was that the conduct *bordered* on the criminal, not that it actually was criminal. The other statements complained of are merely expressions of outrage as opposed to actual accusations of criminal conduct.

Similarly, the category of libel *per se* imputing unfitness or want of integrity in the performance of the duties of an office is not implicated. This category of libel *per se* is limited to those cases where the individual allegedly defamed is the holder of a public office. *Cooper v. Rockford Newspapers, Inc.,* 50 Ill.App.3d 247, 8 Ill.Dec. 506, 365 N.E.2d 744 (2nd Dist.1977). In this case there is no assertion that Spelson was a public official. Likewise, the category of statements accusing one of having a communicable disease is not applicable to the case at bar.

Finally, there is no assertion that Dr. Spelson lacks the ability to perform in his profession. Dr. Spelson is a chiropractor. By definition, a chiropractor is an individual who is among those licensed for "Treating human ailments without drugs or medicines and without operative surgery." Ill. Rev.Stat. ch. 111, ¶ 4411 (1983). Insofar as Spelson is accused of dispensing drugs, he necessarily cannot be acting as a chiropractor. As to his overall treatment methods, it is the validity of the treatments and not

his ability to perform as a chiropractor which are questioned. Clearly, Spelson has not stated a claim for libel *per se.*

Spelson's attempt to state a claim for libel *per quod* also must fail. In order to claim libel *per quod,* special damages must be alleged.

Spelson alleges in Count I:

18. That the Plaintiff has suffered great loss of both a personal and financial nature as a result of these broadcasts and his reputation in the community as well as with his own clientele has been essentially destroyed.

19. That the Plaintiff suffered great personal monetary loss in addition to the losses as stated in paragraph 18 above, more specifically, destroying his promotion and sale of a medical device which had been ready for display to prospective distributors on a nationwide and perhaps international basis.

(a) That said device had been developed and perfected by Plaintiff over many years and that patents are currently pending on it.

(b) That the series of broadcasts of the Defendant entitled "Cashing in On Cancer" depicting the Plaintiff and others in a libelous and slanderous manner caused the failure of the promotion of said machine.

(c) That a sales seminar relating to said machine on May 13, 1982, was poorly attended and a failure due to said broadcasts.

(d) That Plaintiff has lost many years of work, and several millions of dollars, due to Defendant's libelous and slanderous statements about him.

Plaintiff's allegations of damage are grossly lacking in specificity. The complaint wholly fails to allege which statements caused what damage, how such statements damaged plaintiff, the exact amounts of alleged damages and, in addition, fails to show that were it not for the broadcast, plaintiff's "device" would have sold and been well received and that plaintiff's sales seminar would have been well attended. Finally, Plaintiff fails to specif-

ically allege loss of custom. *Cf. Continental Nut Co. v. Robert Berner Co.,* 345 F.2d 395 (7th Cir.1965). Based on the foregoing, it is obvious that plaintiff has failed to state a claim for libel *per quod.*

## CONCLUSIONS

This Court finds it wholly incredible that plaintiff Spelson could expect to engage in a method of treatment which, at best, is highly controversial, without drawing severe and detailed criticism. This is especially true in light of the highly sensitive subject matter involved.

There may be no more serious or critical issue extant today than the health of human beings. Given the frailty of human existence, any controversy on the subject must be afforded wide open discussion and criticism so that individuals may make well educated health care choices. This is especially so in cases where serious disease is involved or death is imminent.

Were the case at bar to proceed to a trial on the merits, the proceedings would very likely result in an open criticism of Dr. Spelson's controversial methods by individuals more in the mainstream of medical science. The ultimate resolution of such a confrontation would be that many approaches to medical science exist, some of which are generally accepted, others of which are not. Those approaches which have not withstood the tests of time and outcome may be subject to harsh criticism compared to more traditional methods. If Dr. Spelson is a true pioneer, that is a risk he will have to face.

The Seventh Circuit has stated, "[A] court should not shrink from granting summary judgment, if authorized and appropriate, to avoid needless trials." *Thornton v. Evans,* 692 F.2d 1064, 1075 (7th Cir.1982). For the reasons stated herein, there being no genuine issues of material fact, summary judgment is entered for defendant.

IT IS SO ORDERED.